Alice **BLOUIN**, As Administratrix of the Estate of Sheila Pouliot, and of the Goods, Chattels and Credits Which Were of the Deceased, Sheila Pouliot, Plaintiff,

v.

Eliot L. **SPITZER**, Individually, and In His Official Capacity as Attorney General of the State of New York; Winthrop H. Thurlow, Individually, and In His Official Capacity as Assistant Attorney General of the State of New York; John Doe, Jane Doe, John Poe, Jane Poe, John Roe, and Jane

Roe (The Names of These Individuals Are Fictitious, the True Names of Said Individuals Unknown To Plaintiff at This Time), Individually, and In Their Official Capacities as Officers and/or Employees, Respectively, of the Attorney General's Office of the State of New York (the Department of Law), the New York State Office of Mental Retardation and Developmental Disabilities, and University Hospital/Suny HSC at Syracuse, Defendants.

No. 01CV0925HGMGJD.

United States District Court, N.D. New York.

July 22, 2002.

Greene & Reid, LLP (James E. Reid, Esq., of counsel), Syracuse, NY, for Plaintiff.

Eliot L. Spitzer, Attorney General of the State of New York (Karen Marcoux Mankes, Assistant Attorney General, of Counsel), Albany, NY, for Defendants Spitzer and Thurlow.

## MEMORANDUM—DECISION AND ORDER

MUNSON, Senior District Judge.

Currently before the court is defendants' motion for summary judgment, converted from a Rule 12(b)(6) motion to dismiss. For the reasons that follow below, defendants' motion is GRANTED.

## BACKGROUND

Plaintiff is the sister and administratrix of the Estate of Sheila Pouliot. Since the age of nine months, Ms. Pouliot "was a profoundly mentally and physically handicapped person" and "was totally dependent upon others ... for all her basic functions" during her 42 years of life. As a result, Ms. Pouliot was a long-term resident of a group home operated by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") in Syracuse, New York.

On December 21, 1999, Ms. Pouliot was admitted to University Hospital of the State University of New York Upstate Medical Center at Syracuse ("University Hospital") suffering from gastrointestinal bleeding. The following day, plaintiff asked Ms. Pouliot's treating physicians to withhold nutrition, hydration, and antibiotics. Meetings were held with her family, treating physicians, University Hospital's Ethics Committee and clergy to discuss her medical treatment. There was an agreement among the parties that only palliative treatment would be maintained and that any resuscitative treatment, if successfully attempted, would only prolong Ms. Pouliot's suffering.

On December 27, 1999, Regina S. McGraw and Joshua A. Barwick, Associate Counsels in the State University of New York Office of University Counsel, contacted defendant Assistant Attorney General Winthop H. Thurlow. Associate Counsel McGraw described Ms. Pouliot's situation and requested legal advice as to whether anyone was authorized to withdraw life-sustaining hydration and nutrition from a mentally-retarded individual who had never been competent to make such a decision. After additional review of the facts and the applicable law, AAG Thurlow advised Associate Counsel McGraw that it was his opinion that New York law does not authorize anyone to withdraw artificial hydration and nutrition from an individual like Ms. Pouliot. Later that day, artificial hydration and intravenous antibiotics were re-initiated.

On December 30, 1999, AAG Thurlow, on behalf of University Hospital, commenced a proceeding seeking the appointment of a temporary guardian *ad litem* to make treatment decisions for Ms. Pouliot, other than those involving the withholding or withdrawal of life-sustaining treatment. Subsequently, the Honorable James C. Tormey, III, Supreme Court Justice of the State of New York, appointed Gerald J. Neri, Esq. as Ms. Pouliot's guardian *ad litem*.

Later that day, Justice Tormey held a hearing at University Hospital, attended by family members, treating physicians,

University Hospital counsel and administration, Mr. Neri and AAG Thurlow. During the hearing, the treating physicians informed the court that there is a 14–day period during which is it medically appropriate to withhold nutrition and that it was their intention to do so while continually assessing Ms. Pouliot's readiness to receive nutrition. The treating physicians also testified that further treatment to provide nutrition to Ms. Pouliot would result in prolonging her agony without any significant health or medical benefits. On January 3, 2000, Justice Tormey issued an Order based upon the testimony presented at the hearing that all medical treatment for Ms. Pouliot be terminated, except for nutrition, as tolerated, and palliative hydration care.

On January 4, 2000, fourteen days since Ms. Pouliot had last received nutrition, the guardian *ad litem* and plaintiff commenced an Article 78 proceeding and petitioned the Supreme Court of New York to enjoin permanently the State of New York, its agents, officers and/or employees from further medical intervention, nutritional sustenance, or other life-sustaining treatment for Ms. Pouliot. At a hearing held that same day, plaintiff modified her application to seek the appointment of a surrogate decision-making committee to make decisions for Ms. Pouliot pertaining to hydration and nutrition. At the conclusion of the hearing, Justice Tormey temporarily enjoined the named respondents from providing any medical intervention with regard to nutritional sustenance.

On January 7, 2000, the parties appeared again before Justice Tormey and sought to have the January 4, 2000 temporary restraining order vacated on the basis of an agreement reached the previous day between the parties and treating physicians. The agreed-upon treatment plan called for Ms. Pouliot to receive 900 calories per day of dextrous solution through her intravenous line and an additional small amount of dextrous solution through her gastrointestinal tube. As a result of the agreement, the temporary restraining order was vacated and the Article 78 proceeding was terminated.

During the course of the next two months, Ms. Pouliot's condition worsened. On March 1, 2000, Justice Tormey held another hearing on the matter. The hearing was requested by plaintiff, who sought to revise the treatment plan adopted on January 7, 2000. The court heard testimony from two physicians relating to the care and condition of Ms. Pouliot, as well as from a family member as to her wishes and impressions of the current and past condition of Ms. Pouliot. Thereafter, Justice Tormey issued a bench decision, which was reduced to a written Order dated March 2, 2000. The Order terminated hydration for Ms. Pouliot and continued the administration of pain medication through her intravenous line. On March 1, 2000, University Hospital ceased administering any hydration or nutrition to Ms. Pouliot.

The Office of the Attorney General, as the attorney for OMRDD, immediately filed a Notice of Appeal and sought a stay of Justice Tormey's Order until the Appellate Division, Fourth Department, could hear the case on March 7, 2000. On March 3, 2000, the Honorable John T. Lawton, Associate Justice of the Appellate Division, Fourth Department, issued an Order vacating the automatic, statutory stay and enforcing the terms of the March 2, 2000 Order. On March 6, 2000, Ms. Pouliot died.

On March 5, 2001, plaintiff filed suit in the Supreme Court of New York. This action is a civil suit brought under 42 U.S.C. § 1983 alleging, *inter alia*, that defendants violated Ms. Pouliot's rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution. However, in its

Memorandum of Law in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss, plaintiff states that the Fifth and Eighth Amendment claims will not be pursued. Plaintiff also raises pendent state claims of negligence, unlawful practice of medicine, battery, and intentional and/or reckless infliction of emotional and mental distress and anguish, and additional claims under the New York State Constitution.

The summons and complaint were served on defendants Eliot L. Spitzer, Attorney General of the State of New York, and AAG Thurlow on May 21, 2001.[1] On June 11, 2001, defendants removed the action to the United States District Court for the Northern District of New York, pursuant to 28 U.S.C. § 1441. Plaintiff did not oppose removal of the action.

On October 1, 2001, defendants filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that it fails to state a claim upon which relief can be granted. Plaintiff entered opposition to the motion.

On November 5, 2001, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, this court issued an Order converting defendants' motion to dismiss into a motion for summary judgment and providing the parties with a reasonable opportunity to present all materials pertinent to a motion for summary judgment to the court.

Currently before this court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has entered opposition to this motion and oral argument was heard in Albany, New York on April 29, 2002.

## DISCUSSION

### I. Standard for Summary Judgment

The standard for summary judgment is well-settled. Rule 56 of the Federal Rules of Civil Procedure allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). A motion for summary judgment may be granted when the moving party carries its burden of showing that no triable issues of fact exist. *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *See id.; United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Ze-*

---

1. No service of process has been made on the fictitiously named defendants who are purportedly employed by the New York State Department of Law, the New York State Office of Mental Retardation and Developmental Disabilities, and the University Hospital/SUNY Health Science Center at Syracuse. Accordingly, AAG Mankes does not appear on their behalf in this matter and they are not included in subsequent discussion pertaining to "defendants."

*nith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *See id.* at 250–251, 106 S.Ct. 2505.

## II. *Absolute and Qualified Immunity Defenses*

Defendants assert that plaintiff's claims are barred by the doctrines of absolute and qualified immunity.

### A. *Absolute Immunity*

█ Defendants argue that they are absolutely immune from plaintiff's § 1983 claims. The actions of a prosecutor are not covered by absolute immunity merely because they were performed by a prosecutor. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001). In order to make a determination on an absolute immunity claim, the court must utilize a "functional approach," examining "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons,* 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). To do so, the court must inquire whether the challenged actions "are part of a prosecutor's traditional functions," and "whether they are closely associated with the judicial process." *Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996) (internal quotations omitted).

Defendants claim that they merely provided legal advice to University Hospital with respect to the issues of whether any person had the authority to discontinue life-sustaining treatment for Ms. Pouliot and whether anyone was authorized to make other non-life-sustaining treatment decisions. Once defendants realized that there was no one authorized to make non-

life-sustaining treatment decisions for Ms. Pouliot, defendants also claim that they began preparations for and sought the appointment of a temporary guardian *ad litem.* Defendants argue that these actions are imbued with absolute immunity because all of plaintiff's § 1983 claims are connected to defendants' application for temporary guardianship and the subsequent appearances before Justice Tormey.

In support of their argument, defendants cite *Scott v. Hern.* 216 F.3d 897 (10th Cir.2000). In *Scott,* plaintiff filed suit against various individuals, including a county attorney, who participated in his involuntary commitment to a mental institution. The court recognized that "state attorneys and agency officials who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings" are "absolutely immune from suit under § 1983 concerning activities 'intimately associated with the judicial ... process.'" *Id.* at 908 (quoting *Pfeiffer v. Hartford Fire Ins. Co.,* 929 F.2d 1484, 1490 (10th Cir.1991) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976))). However, the court also stated that it is guided by the following principle: "The more distant a function is from the judicial process and the initiation and presentation of the state's case, the less likely it is that absolute immunity will attach." *Id.* Based upon the applicable legal principles, the court found that the county attorney was absolutely immune from a § 1983 claim arising from her role in the civil commitment proceeding because the allegedly improper actions were "intimately associated" with the proceeding—she was acting pursuant to her statutory obligation to conduct the proceeding once the petition for a 72–hour evaluation had been submitted. *Id.* at 909.

In the present case, defendants are not entitled to assert the defense of absolute

immunity. Unlike in *Scott,* defendants actions began prior to the commencement of any judicial proceeding and they were not pursuant to any statutory obligation. Additionally, defendants initial actions—providing legal advice to University Hospital—are neither part of a prosecutor's traditional functions nor are they closely associated with the judicial process. Although defendants subsequent actions were arguably related to the judicial process, they did not have the requisite intimate association necessary for a finding of absolute immunity. Therefore, the court finds that defendants are not entitled to absolute immunity in this instance.

### B. *Qualified Immunity*

Additionally, defendants argue that they are entitled to qualified immunity from plaintiff's § 1983 claims. Qualified immunity protects public officials from civil liability if their actions were objectively reasonably, as evaluated in the context of legal rules that were clearly established at the time. *See Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002); *Vega v. Miller,* 273 F.3d 460, 466 (2d Cir.2001). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute liability, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* Therefore, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v.*

*Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

As a threshold matter while evaluating a motion for summary judgment on the basis of qualified immunity, the court must inquire whether, construing the facts in the light most favorable to plaintiff, "the facts alleged show the [public official's] conduct violated a constitutional right." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. If so, the court must determine whether the right in question was clearly established at the time of the violation; that is, whether "it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *Id.* Therefore, a qualified immunity defense is established when "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Poe,* 282 F.3d at 133.

As previously stated, plaintiff claims that defendants violated Ms. Pouliot's rights under the First, Fourth, and Fourteenth Amendments. Based upon the subsequent analysis, the court finds that plaintiff has failed to allege a violation of a clearly established right. Assuming *arguendo* that the court found a violation, it could not be concluded that such a right was so clearly established that it was objectively unreasonable for defendants to believe that their actions did not violate the law, so qualified immunity from plaintiff's § 1983 claims would be appropriate.

### 1. *First Amendment Privacy Claim*

■ Plaintiff claims that Ms. Pouliot had a privacy right, secured to her under the First Amendment, which was violated when defendants sought to secure artificial hydration and nutrition without the consent of plaintiff or her family. However, it does not appear that the First Amendment is the source of any privacy right at issue in this case. Plaintiff argues that the right

to privacy includes "the interest in independence in making certain kinds of important decisions." This is true, but this interest is founded in the Fourteenth Amendment's concept of personal liberty, not by the First Amendment. *See Whalen v. Roe,* 429 U.S. 589, 599, n. 26, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Therefore, plaintiff has not alleged a violation of the right to privacy pursuant to the First Amendment.

### 2. Fourth Amendment Excessive and Unreasonable Force Claim

■ Plaintiff claims that defendants, acting under color of law, willfully and unreasonably seized and detained Ms. Pouliot in order to physically subject her to non-consensual invasive medical treatment that was brutal, excessive, and unreasonable physical force in violation of her Fourth Amendment rights. In addressing an excessive force claim brought under § 1983, the court must initially identify the specific constitutional right allegedly infringed by the challenged application of force. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Once identified, the validity of the claim must be judged by reference to the specific constitutional standard that governs that right, rather than by some generalized "excessive force" standard. *See id.*

In the present case, plaintiff claims that Ms. Pouliot's Fourth Amendment rights were infringed by defendants' actions. Therefore, the claim must be evaluated by the Fourth Amendment standard. "The Fourth Amendment prohibits unreasonable seizures; it is not a general prohibition of all conduct that may be deemed unreasonable, unjustified, or outrageous." *Medeiros v. O'Connell,* 150 F.3d 164, 167 (2d Cir.1998). A seizure under the Fourth Amendment requires purposeful conduct -

> [A] [v]iolation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act.

*Brower v. County of Inyo,* 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

The common law right to decline medical treatment, even life-sustaining treatment, absent an overriding state interest, is well-settled under New York law. *See Schloendorff v. Society of N.Y. Hosp.,* 211 N.Y. 125, 129–30, 105 N.E. 92 (1914); *Matter of O'Connor,* 72 N.Y.2d 517, 528, 534 N.Y.S.2d 886, 531 N.E.2d 607 (1988). Because the right arises from the doctrine of informed consent, it is "personal and, under existing law in this State, [can] not be exercised by a third party when the patient is unable to do so."[2] *O'Connor,* 72

---

**2.** Plaintiff points out that Section 2796 of the New York Public Health Law allows a court to issue a do-not-resuscitate ("DNR") order "where the patient has a terminal condition, is permanently unconscious, or resuscitation would impose an extraordinary burden on the patient in light of the patient's medical condition and the expected outcome of resuscitation for the patient, and issuance of an order ... is consistent with ... the patient's best interests." Plaintiff claims that the existence of this statutory provision contradicts defendants' argument that no one can exercise the right to deny life-sustaining medical treatment on behalf of a never-competent individual. Plaintiff's argument is without merit because § 2796 pertains to an entirely different situation than the one currently before the court. A DNR is an order not to attempt cardiopulmonary resuscitation in the event a patient suffers cardiac or respiratory arrest; that said, it contemplates a *potential* future situation where death is imminent. In stark contrast, plaintiff is arguing for the right of a third party to withdraw or terminate artificial nutrition and hydration, which would consti-

N.Y.2d at 528, 534 N.Y.S.2d 886, 531 N.E.2d 607. In situations where a patient previously possessed the mental capacity to decline life-sustaining treatment, but has since become incompetent, New York law will authorize the refusal or termination of such treatment only where there is "clear and convincing" evidence of the patient's intentions under the circumstances. *See Matter of Storar v. Storar*, 52 N.Y.2d 363, 378–79, 438 N.Y.S.2d 266, 420 N.E.2d 64 (1981). Therefore, in the absence of specific legislation, and where there is no evidence of personal intent, a third party has no recognized right to decide that a patient's quality of life has declined to a point where treatment should be withheld and the patient allowed to die. *See People v. Eulo*, 63 N.Y.2d 341, 357, 482 N.Y.S.2d 436, 472 N.E.2d 286 (1984).

Several statutes address the ability of a third party to make medical treatment decisions on behalf of another, but none of them would allow a third party to make the type of decision to discontinue life-sustaining treatment that is at issue in this case. In situations where a patient was always totally incapable of understanding or making a reasoned decision about medical treatment, his rights must be evaluated as if he were an infant. *See Storar*, 52 N.Y.2d at 380, 438 N.Y.S.2d 266, 420 N.E.2d 64. Public Health Law § 2504(2) authorizes a parent or guardian to give effective consent for medical treatment for an infant. However, the parent or guardian may not deprive a child of life-saving treatment, however well-intentioned. *See Storar*, 52 N.Y.2d at 380, 438 N.Y.S.2d 266, 420 N.E.2d 64. "Even when the parents' [or guardians'] decision is based on constitutional grounds, such as religious beliefs, it must yield to the State's interests, as *parens patriae*, in protecting the health

and welfare of the child." *Id.* at 380–381, 438 N.Y.S.2d 266, 420 N.E.2d 64.

Additionally, Article 81 of the Mental Hygiene Law does not authorize an appointed guardian to make a decision to discontinue life-sustaining treatment. Article 81 is expressly neutral on the issue and specifically states:

> Nothing in this article shall be construed either to prohibit a court from granting, or to authorize a court to grant, to any person the power to give consent for the withholding or withdrawal of life sustaining treatment, including artificial nutrition and hydration.

Ment. Hyg. Law § 81.29(e).

Finally, any surrogate decision-making committee convened pursuant to Article 80 of the Mental Hygiene Law is also unauthorized to make a decision to discontinue life-sustaining treatment. The express statutory authority of such a committee does not extend to decisions to discontinue life-sustaining treatment; in fact, Article 80 specifically excludes the "administration of ... nutrition" and "the withdrawal or discontinuance of medical treatment which is sustaining life functions" from the jurisdiction of a surrogate decision-making committee. Ment. Hyg. Law § 80.03(a).

Although plaintiff claims that defendants acted willfully to seize Ms. Pouliot, intentionally taking advantage of her incapacity to take control of her person and to restrain her, this cannot be considered a seizure under the "objective reasonableness" standard of the Fourth Amendment. Assuming *arguendo* that defendants did, in fact, order Ms. Pouliot's treating physicians to administer invasive medical treatment without her consent, these actions cannot be considered objectively unreason-

---

tute an *actual* affirmative act to deprive an individual of sustenance without which they could not possibly survive. Although literally

true, plaintiff's argument does not affect the court's analysis of the applicable New York law for the present case.

able. As previously discussed, in this type of situation, New York law does not allow a third party to decide that the quality of life of another has declined to a point where treatment should be withheld and the patient should be allowed to die. Whether defendants merely informed Associate Counsels McGraw and Barwick of this or directly ordered the administration of medical treatment is irrelevant. In either situation, their actions were objectively reasonable given the state of the law in New York, so it cannot be concluded that an unreasonable seizure prohibited by the Fourth Amendment occurred.

### 3. *Fourteenth Amendment Due Process Claim*

 Plaintiff claims that defendants violated Ms. Pouliot's constitutional rights under the Due Process Clause of the Fourteenth Amendment because they prohibited a conscientious surrogate from making critical medical decisions in the best interests of Ms. Pouliot.[3] The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property without due process of law." The Supreme Court has recognized a competent individual's general liberty interest in refusing medical treatment. *See Vitek v. Jones,* 445 U.S. 480, 494, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). However, the Court has not expressly recognized a similar liberty interest for incompetent individuals. *See Cruzan v. Missouri Dep't of Health,* 497 U.S. 261, 279–280, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Regardless, the determination of whether or not an in-

dividual has a liberty interest does not conclude the inquiry—the issue of "whether [an individual's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

In *Cruzan,* the Supreme Court held that the United States Constitution does not forbid a state from establishing a procedural safeguard to assure that the actions of a surrogate conform as closely as possible to the expressed wishes of a formerly-competent patient. 497 U.S. at 280, 110 S.Ct. 2841. Similar to New York in this case, Missouri law requires evidence of the incompetent's wishes as to the withdrawal of life-sustaining treatment be proven by "clear and convincing" evidence. *Id.* In rendering its decision, the Court weighed the relevant State interests pertaining to the protection and preservation of human life against the claimed liberty interest. *Id.* It noted that "[t]he choice between life and death is a deeply personal decision of obvious and overwhelming finality" and "a State may properly decline to make judgments about the 'quality' of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life to be weighed against the constitutionally protected interest of the individual." *Id.* at 281–82, 110 S.Ct. 2841. The Court also recognized the important State interest of guarding against an erroneous decision to decline or terminate life-sustaining treatment -

---

**3.** Plaintiff also claims that defendants' actions violated Ms. Pouliot's rights under the Due Process Clause of the New York State Constitution. However, the Due Process Clauses of the New York State Constitution and United States Constitution "are formulated in the same words and are intended for the protection of the same fundamental rights of the individual and there is, logically, no room for

distinction in definition of the scope of the two." *Central Savings Bank v. New York,* 280 N.Y. 9, 19 N.E.2d 659 (1939). Therefore, plaintiff's due process claim under the New York Constitution is dismissed for the reasons articulated in the discussion of the due process claim under the United States Constitution.

An erroneous decision not to terminate results in a maintenance of the status quo; the possibility of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patient's intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment at least create the potential that a wrong decision will eventually be corrected or its impact mitigated. An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction.

*Id.* at 283, 110 S.Ct. 2841. After evaluating the applicable State interests, the Court concluded that Missouri permissibly sought to advance these interests through the adoption of a "clear and convincing" standard of proof to govern such a determination.

In the present case, New York courts have recognized similar State interests pertaining to the protection and preservation of human life. Particularly, New York's highest court rejected the objective factors used in the "substituted judgment" approach because it was inconsistent with its "fundamental commitment to the notion that no person or court should substitute its judgment as to what would be an acceptable quality of life for another." *O'Connor,* 72 N.Y.2d at 530, 534 N.Y.S.2d 886, 531 N.E.2d 607. In upholding the "clear and convincing" standard, the court emphasized that it "is a demanding standard, the most rigorous burden of proof in civil cases," but "[i]t is appropriate here because if an error occurs it should be made on the side of life." *Id.* at 531, 534 N.Y.S.2d 886, 531 N.E.2d 607.

New York has a strong interest in protecting Ms. Pouliot from a third party's determination as to what she would consider to be an acceptable quality of life and, therefore, whether the decision to withdraw life-sustaining hydration and nutrition would be appropriate under the circumstances. The Supreme Court has recognized that "[c]lose family members may have a strong feeling—a feeling not at all ignoble or unworthy, but not entirely disinterested—that they do not wish to witness the continuation of the life of a loved one which they regard as hopeless, meaningless, and even degrading." *Cruzan,* 497 U.S. at 286, 110 S.Ct. 2841. However, "there is no automatic assurance that the view of close family members [would] necessarily be the same as the patient's would have been had she been confronted with the prospect of her situation while competent." *Id.* Taking this into account, defendants, in either advising Associate Counsels McGraw and Barwick of the applicable New York law or directly ordering the administration of medical treatment, simply acted to ensure that New York law was obeyed—a law that does not violate the Due Process Clause of the Fourteenth Amendment.

Plaintiff also claims that defendants Spitzer and Thurlow utilized their positions, individually and as officers of the State of New York, in a manner that constituted excessive force against Ms. Pouliot, in violation of her Fourteenth Amendment substantive due process rights. The Due Process Clause contains "a substantive component that bars certain arbitrary, wrongful governmental actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (internal citations omitted). Conduct that violates the substantive component "shocks the conscience" and "violates the decencies of civilized conduct." *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

As previously discussed, defendants actions were objectively reasonable given the

state of the law in New York and cannot be described as "shocking the conscience." New York law simply does not allow a third party in a situation such as this to decide that the quality of life of another has declined to a point where treatment should be withheld and the patient should be allowed to die. Therefore, plaintiff has failed to state a due process claim under the Fourteenth Amendment.

4. *Fourteenth Amendment Equal Protection Claim*

█ Plaintiff claims that defendants' conduct in obstructing the withholding of artificial nutrition and hydration constituted an arbitrary and unreasonable form of discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.[4] Specifically, plaintiff alleges four equal protection violation claims:

1. Patients in palliative care like Ms. Pouliot are treated differently from those who are mentally competent and receiving palliative care.

2. The State of New York and defendants permitted surrogate decision-making panels to operate in Albany and New York City, but not in Central and Western New York, which resulted in unequal treatment for mentally disable individuals with the State of New York.

3. Defendant Spitzer handled the issue of medical consent differently in different parts of the State of New York.

4. The differentiation in New York law between a DNR order and other decisions pertaining to life support is so arbitrary that it denies equal protection.

The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *See Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). Specifically, in order to withstand equal protection review, legislation that distinguishes between the mentally disabled and others must be rationally related to a legitimate governmental purpose. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Additionally, when legislation is social or economic in nature, the Equal Protection Clause affords the States wide latitude. *See United States R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 174, 101 S.Ct. 453, 66 L.Ed.2d 368(1980).

Plaintiffs initial claim alleges that competent individuals are treated differently than incompetent individuals under New York law pertaining to palliative treatment. This claim is without merit. The distinction between competent and incompetent has been deemed rational by the Supreme Court. In *Cruzan,* the Court rejected a similar argument and noted:

> The differences between the choice made *by* a competent person to refuse medical treatment, and the choice made *for* an incompetent person by someone else to refuse medical treatment, are so obviously different that the State is war-

---

**4.** Plaintiff also claims that defendants' actions violated Ms. Pouliot's rights under the Equal Protection Clause of the New York State Constitution. However, the Equal Protection Clause of the New York State Constitution is no broader in coverage than its federal counterpart. *See Matter of Esler v. Walters,* 56 N.Y.2d 306, 313–14, 452 N.Y.S.2d 333, 437 N.E.2d 1090 (1982). Therefore, plaintiff's equal protection claim under the New York Constitution is dismissed for the reasons articulated in the discussion of the equal protection claim under the United States Constitution.

ranted in establishing rigorous procedures for the latter class of cases which do not apply to the former class. 497 U.S. at 287, n. 12, 110 S.Ct. 2841. Therefore, New York's distinction between competent and incompetent individuals is rationally related to the legitimate state interest of preserving life.

Plaintiff's second claim is similarly without merit. The fact of whether or not there was a surrogate decision-making panel operating in Central or Western New York is irrelevant to this case. As previously discussed, such a committee is unauthorized to make a decision to discontinue life-sustaining treatment. Therefore, its existence or non-existence in a particular area does not give rise to a valid equal protection claim.

Likewise, plaintiff's third claim is without merit. Plaintiff claims that defendant Spitzer handled the issue of consent for mentally disabled individuals differently in different parts of the State of New York. In support, plaintiff cites to *In the Matter of Dreythaler*, 183 Misc.2d 307, 702 N.Y.S.2d 799 (2000), which dealt with the issue of informed consent for a mentally disabled person requiring comprehensive dental treatment performed under general anesthesia. It cannot be concluded that *Dreythaler* supports a claimed violation of equal protection. There is a tremendous difference between decisions involving dental treatment and the termination of life-sustaining treatment. Therefore, such a comparison cannot form the basis of an allegation that similarly situated individuals were treated differently.

■ Plaintiff's final equal protection claim is also without merit. Plaintiff submits that the differentiation in New York law between DNR orders and other forms of orders pertaining to life support is so arbitrary as to deny equal protection. Plaintiff argues that suffering patients like Ms. Pouliot have just as strong an interest in avoiding other forms of life support as they do in avoiding cardiopulmonary resuscitation and to the extent the state has an interest in averting arbitrary quality of life determinations by surrogates, its interest is just as applicable to DNR orders as it is to other forms of medical intervention. The availability of a DNR order in New York is irrelevant to this case because the decision to sign such an order and the decision to cause death by the withdrawal of life-sustaining treatment are not comparable. These decisions are faced by individuals that are not similarly circumstanced, so the differentiation in treatment does not violate the Equal Protection Clause.

### III. Plaintiff's Survival Actions Pursuant to Article 11, Part 3 of the Estates, Powers and Trusts Law of the State of New York

#### A. Negligence

In order to establish a claim for negligence, plaintiff must establish a duty, a breach of that duty, proximate cause, and damages. However, "when a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Hansel v. Sheridan* 991 F.Supp. 69, 75–76 (N.D.N.Y.1998) (McAvoy, C.J.). Therefore, plaintiff's negligence claim must be dismissed.

#### B. Unlawful Practice of Medicine

■ Plaintiff argues that § 6512 of the Education Law creates a private right of action for the unauthorized practice of medicine and defendants oppose such an argument. Independent of the validity of plaintiff's argument, plaintiff has failed to allege a claim for unlawful practice of medicine. Section 6521 of the Education Law defines the practice of medicine as "diag-

nosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition." Defendants' actions cannot be considered to fall under the "practice of medicine" umbrella because they were legal in nature, not medical. The actions can no more be construed as the unlawful practice of medicine than the actions of a judge who signs an involuntary treatment order. Therefore, plaintiff's claim is without merit and must be dismissed.

## C. *Battery*

■ Plaintiff claims that defendants committed a battery when they unilaterally ordered medical intervention, contrary to the wishes of Ms. Pouliot's family and treating physicians. Under New York law, a battery is "an intentional wrongful physical contact with another person without consent." *Girden v. Sandals Intern.*, 262 F.3d 195, 203 (2d Cir.2001). However, one who exercises reasonable force in the discharge of an official or public duty is generally not liable for a battery. *See Savarese v. New York Hous. Auth.*, 172 A.D.2d 506, 567 N.Y.S.2d 855 (2d Dept. 1991). Whether defendants merely informed Associate Counsels McGraw and Barwick of the applicable New York law or directly ordered the medical treatment is irrelevant to this claim. As previously discussed, New York law does not permit a third party to decide that the quality of life of another has declined to a point where treatment should be withheld and the patient should be allowed to die. Therefore, defendants actions were either permissible or reasonable, and plaintiff's battery claim must be dismissed.

## D. *Intentional and/or Reckless Infliction of Emotional and Mental Distress and Anguish*

■ Under New York law, a claim of intentional infliction of emotional distress requires: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir.2001). The standard for stating a valid claim of intentional infliction of emotional distress is "rigorous, and difficult to satisfy." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993) (citations omitted). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999) (quoting *Howell*, 81 N.Y.2d at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699). Once again, whether defendants merely informed Associate Counsels McGraw and Barwick of the applicable New York law or directly ordered the medical treatment is irrelevant to this claim. As previously discussed, New York law does not permit a third party to decide that the quality of life of another has declined to a point where treatment should be withheld and the patient should be allowed to die. Therefore, defendants actions were reasonable and certainly were not beyond all possible bounds of decency, and plaintiff's intentional infliction of emotional distress claim must be dismissed.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED**, that defendants' motion for summary judgment is **GRANTED** and the complaint is hereby **DISMISSED** in its entirety. It is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum—Deci-

sion and Order upon the parties by regular mail.

**IT IS SO ORDERED**.