OPINION OF THE COURT
Raymond E. Cornelius, J.
An order, dated November 1, 1999, directed the respondent, *308 Fanny Dreythaler, to show cause why a further order should not be granted, pursuant to Mental Hygiene Law § 33.03 and 14 NYCRR 633.11 (b), to conduct a surgical procedure of comprehensive dental treatment under general anesthesia. The application was based upon the petition of the executive medical director of the Finger Lakes Developmental Disabilities Service Office, which is a local regional office of the New York State Office of Mental Retardation and Developmental Disabilities (OMRDD). At one time, the respondent was a patient at the Syracuse Developmental Center. However, in 1993, she became a voluntary resident at the West Sparta Community Residence and currently resides at the Derby Individualized Residential Alternative, which is licensed by ÓMRDD and operated by the Finger Lakes Developmental Disabilities Service Office.*
The petition alleges that the respondent, who was born in 1935, has been retarded for an extensive period of time, and has an IQ of 36, based upon a psychological evaluation, dated April 9, 1996. The application before the court was accompanied by diagnoses, submitted by a physician and a dentist, which indicate that the respondent has “fairly poor oral hygiene with at least six teeth with restorative needs and only fair ability to cooperate with treatment.” Therefore, the application for comprehensive dental treatment, which would include examinations, X-rays, cleaning, filling and extraction of badly decayed and/or infected teeth, included the request that the treatment be conducted under general anesthesia. The petition submitted by the executive medical director asserts that the respondent is totally and permanently disabled because of mental retardation and is not capable of giving consent to the recommended procedure.
Pursuant to the order to show cause, the Mental Hygiene Legal Service was assigned as counsel to protect the interests of the respondent. The respondent was interviewed on three occasions, and the representation has now been made that the respondent objects to the proposed dental treatment plan. In addition, the Mental Hygiene Legal Service has now made a motion to dismiss the petition, pursuant to CPLR 3211 (a), on *309 grounds that the court lacks jurisdiction and that the petition fails to state a cause of action. Counsel also takes the position that the petitioner lacks standing to bring a proceeding for involuntary medical or dental treatment because the respondent is a voluntary resident in a community-based residence facility.
Article 33 of the Mental Hygiene Law generally addresses the rights of patients. In relevant part, section 33.03 of the article provides as follows:
“(a) Each patient in a facility and each person receiving services for mental disability shall receive care and treatment that is suited to his needs and skillfully, safely, and humanely administered with full respect for his dignity and personal integrity.
“(b) Subject to regulations of the commissioner, the director of a facility shall require the following in order to assure protection of patients in their care and treatment * * *
“2. medical and dental evaluations and evaluations of mental disabilities of inpatients by qualified professionals no less frequently than once a year * * *
“4. consent for surgery” (emphasis added).
“ ‘Patient’ means a person receiving services for the mentally disabled at a facility.” (Mental Hygiene Law § 1.03 [23].) “ ‘Facility’ means any place in which services for the mentally disabled are provided.” (Mental Hygiene Law § 1.03 [6].) The same subdivision lists examples of a facility, which are not exclusive, but does state that a facility would not include a place where the services rendered consist solely of nonresidential services for the mentally disabled, which may be exempt from the certification requirements of article 16 of the Mental Hygiene Law. The term “mental disability” includes mental retardation, and “[a] mentally disabled person is one who has a mental disability.” (Mental Hygiene Law § 1.03 [3].) Finally, the statute provides that “ ‘[s]ervices for the mentally disabled’ means examination, diagnosis, care, treatment, rehabilitation, or training of the mentally disabled.” (Mental Hygiene Law § 1.03 [4].)
Article 15 of the Mental Hygiene Law contains provisions relating to voluntary and involuntary admissions to schools for the mentally retarded. However, schools do not include a facility licensed as an intermediate care facility, a community residence, or a family care home. (Mental Hygiene Law § 15.03.) Article 16, which is entitled “Regulation and Quality of *310 Services,” confers broad powers on the Commissioner of the Office of Mental Retardation and Developmental Disabilities to regulate the quality of services in facilities, other than schools, including the adoption and promulgation of regulations.
Administrative regulations have been promulgated pursuant to statutory authority, including Mental Hygiene Law article 16 and § 33.03. (See, 14 NYCRR part 633 [statutory authority].) Insofar as relevant to the pending case, 14 NYCRR 633.11 provides as follows:
“§ 633.11 Medical treatment.
“(a) Principles of compliance.
“(1) Consent for professional medical treatment.
“(i) In any case where professional medical treatment (see glossary, section 633.99 of this Part) is proposed to be rendered to a person for which informed consent (see glossary) would be required by applicable law, the chief executive officer shall ensure assistance in obtaining such informed consent by or on behalf of such person. In every case it shall be the duty of such chief executive officer to ensure that the person is personally afforded an appropriate explanation of any proposed professional medical treatment * * *
“(iii) Informed consent may be obtained for those persons who are residents of a facility operated or certified by OMRDD as follows:
“(b) If a person is 18 years of age or older, but lacks capacity to understand appropriate disclosures regarding proposed professional medical treatment or a determination of insufficient capacity has been made pursuant to clause (d) of this subparagraph, informed consent to such proposed professional medical treatment shall be obtained from a guardian lawfully empowered to give such consent, an actively involved spouse, an actively involved parent, an actively involved adult child, a surrogate decisionmaking committee or a court of competent jurisdiction. Consent shall be sought for the proposed professional medical treatment from parties on this list in the order stated.”
As far as can be ascertained, the respondent has no parent or guardian. The reference, in the regulations, to a surrogate decision-making committee is based upon enactment of article 80 of the Mental Hygiene Law. In this article, the Legislature established a State-wide quasi-judicial surrogate decision-making process, whereby committees and panels would be formed to determine a patient’s capacity to consent to or refuse *311 medical treatment and assess whether the proposed treatment would promote the patient’s best interest. Provision is made for judicial review of a panel’s determination by Supreme Court, pursuant to CPLR article 78 (Mental Hygiene Law § 80.09). Inexplicably, however, a committee has never been established for the western part of New York State, and accordingly, there is no surrogate decision-making committee available to determine the respondent’s ability to consent, or the appropriateness of the proposed treatment.
The court would agree with counsel for the respondent that there are certainly alternative remedies, which may result in conferring surrogate decisionmaking on court appointees, including guardianships under Mental Hygiene Law article 81 or SCPA article 17-A. In addition, there is provision for a “short-term involuntary protective services order” under Social Services Law § 473-a (5) (a). However, the fact that neither petitioner nor any other party has made application under these statutory provisions should not deprive the court of jurisdiction to grant its own consent and authorize appropriate treatment.
Administrative regulations certainly are insufficient, alone, to confer jurisdiction upon a court. Nevertheless, as hereinbefore discussed, Mental Hygiene Law articles 16 and 33, as well as other sections, confer authority on the Commissioner to promulgate regulations. Further, as used in Mental Hygiene Law § 33.03 and based upon the definitions contained in section 1.03, the respondent must be considered a “patient” who resides in a “facility” and receives “services for mental disability.” As such, the respondent, notwithstanding her voluntary status and community-based residence, should not be considered any different than any other patient, for whom consent applications are frequently made to the court, pursuant to Mental Hygiene Law § 33.03. Of course, as with any such application, the Commissioner must establish, by clear and convincing evidence, that the respondent lacks the capacity to consent and that the proposed treatment would be in the patient’s best interest.
Aside from any statutory authority, the courts of New York have been recognized as having inherent jurisdiction to confer consent for surgical procedures in situations where a person lacks the capacity to give informed consent. Sometimes, in cases involving mentally retarded persons, reliance is placed upon the parens patriae powers of the court. (See, e.g., Matter of Boothby v Margaret S., 221 AD2d 970 [4th Dept 1995], ap *312 peal dismissed 88 NY2d 1016 [1996]; Matter of Doe, 104 AD2d 200 [4th Dept 1984].) In one case, claims brought under the Mental Hygiene Law by parents of a mentally retarded daughter, who had resided in a community residence, were dismissed because the Court held that the statute did not confer a private cause of action. (McWilliams v Catholic Diocese, 145 AD2d 904 [4th Dept 1988].) It is significant that the case was not dismissed because of the inapplicability of the Mental Hygiene Law, generally, to mentally retarded individuals living in community residences. Indeed, the Court stated that “[t]he Mental Hygiene Law is a regulatory statute by which the Commissioner of the Office of Mental Retardation and Developmental Disabilities is empowered to plan and provide comprehensive services to the State’s mentally retarded citizens.” (Supra, at 904.)
Based upon the foregoing, the court has concluded that the petition is sufficient to state a cause of action, that the petitioner is a proper party to bring this proceeding, and that the court possesses jurisdiction to consider the application. Accordingly, it is hereby ordered that the motion to dismiss, pursuant to CPLR 3211 (a), is denied, and it is further ordered that a hearing be held to determine the respondent’s ability to give informed consent, or the lack thereof, and in the latter event, whether the proposed treatment would be in her best interests.

 According to an affidavit submitted by an Associate General Counsel for •the New York State Office of Mental Retardation and Developmental Disabilities, there are approximately 540,000 mentally retarded citizens in New York, of whom about 105,000 are served by OMRDD. However, only about 2,000 of these individuals receive in-patient care and treatment in State schools and only a fraction of those individuals require involuntary care and treatment.