Alice BLOUIN, As Administratrix of the ESTATE OF Sheila POULIOT, and of the Goods, Chattels and Credits Which Were of the Deceased, Sheila Pouliot, Plaintiff–Appellant,

v.

Eliot L. SPITZER, Individually, and in his Official Capacity as Attorney General of the State of New York; Winthrop H. Thurlow, Individually, and in his Official Capacity as Assistant Attorney General of the State of New York, Defendants–Appellees.

No. 02–7997.

United States Court of Appeals, Second Circuit.

Argued: March 6, 2003.

Decided: Feb. 2, 2004.

Robert M. Goldfarb, Assistant Solicitor General (Daniel Smirlock, Deputy Solicitor General, Peter H. Schiff, Senior Counsel, on the brief), for Eliot Spitzer, Attorney General of the State of New York, Albany, NY, for Defendants–Appellees.

Before: POOLER, SACK, and B.D. PARKER, Circuit Judges.

B.D. PARKER, Jr. Circuit Judge.

Now deceased, Sheila Pouliot suffered profound physical and mental disabilities since infancy and was never competent to make her own medical treatment decisions. In December 1999, incapacitated and terminally ill, she was admitted to the State University of New York ("SUNY") Upstate Medical Center at Syracuse. Aware of her condition, her family, her treating physicians, and other hospital personnel all agreed that only palliative care-without invasive, life-prolonging, or resuscitative measures-was appropriate. Several days later, the New York Attorney General's office intervened. It advised hospital officials that this course of care was contrary to New York law, that no third party was competent to direct the withdrawal of life-prolonging measures from a patient who had never been competent and who, consequently, had never consented to such steps, and that the administration of artificial nutrition, hydration, and antibiotics was required.

This treatment was instituted. Shortly thereafter, the Attorney General's office went to state court seeking and obtaining the appointment of a guardian for Pouliot, although it insisted that the guardian could not consent to the withdrawal of life-prolonging measures. After some initial disagreement, the parties and the guardian agreed to the continued administration of hydration and nutrition, and this was done for approximately two months. It became

James T. Snyder (James E. Reid, on the brief), Greene & Reid, LLP, Syracuse, NY, for Plaintiff–Appellant.

apparent, however, that this course of treatment caused Pouliot intense suffering with no corresponding medical benefits-beyond prolonging her life. She died after this treatment was terminated pursuant to a court order, which was entered over the objections of the Attorney General's office.

Following Pouliot's death, Blouin returned to state court and, on her sister's behalf, sued Eliot Spitzer, the New York Attorney General ("AG"), and Winthrop Thurlow, the assistant AG who had handled the matter (collectively, "the AG's office"), asserting claims under state and federal law. The AG's office removed the case to federal court, where it eventually obtained summary judgment. The district court concluded that, although Spitzer and Thurlow were not entitled to absolute immunity, they were entitled to qualified immunity because their intervention violated no clearly established constitutional right of Pouliot's. Because we agree that they were entitled to qualified immunity, although for reasons somewhat different from the district court's, we affirm.

## BACKGROUND

Sheila Pouliot became profoundly physically and mentally handicapped after contracting encephalitis during infancy. As a consequence, throughout her life she suffered mental retardation and fairly severe cerebral palsy, which was manifested by incomplete quadriparesis. She was completely dependent on others for assistance with basic life functions and resided during her life at a state-run residential group home in Syracuse.

By 1999, Pouliot, in her early forties, had become chronically ill as a result of complications from cerebral palsy, including a seizure disorder, osteoporosis, the dislocation of various joints, and widespread flexion contractures involving her elbows, knees, and hips. She also lost the ability to eat, and nutrition was artificially administered through a feeding tube. She began suffering from serious illness relating to failing gut function, characterized by recurrent aspiration pneumonia, episodes of gastrointestinal bleeding, and chronic, severe constipation.

When she reached the hospital in December, Pouliot was acutely ill and, by all accounts, near death. She was experiencing low oxygen levels and a high fever. She was suffering from hypotension, aspiration pneumonia, internal bleeding, severe abdominal pain, and a non-functioning intestine. Pouliot's family, medical staff, SUNY Hospital's Ethics Committee, and clergy met on December 22 and decided that her condition was terminal and that the appropriate treatment was the provision of palliative care, involving mainly the intravenous delivery of morphine. It was also decided that neither artificial nutrition and hydration nor antibiotics would be administered. This decision was reflected in the contemporaneous notes of Dr. Catherine V. Caldicott, one of Pouliot's treating physicians:

> After >1 hour discussion with team, family, Social Worker, nursing staff, chaplain and Ethics consultant, we are in full agreement that this may be Ms. Pouliot's terminal illness. We agree that the most humane course is to provide comfort in the way of [morphine sulfate] as needed and to refrain from invasive resuscitative and recovery measures.

This course of treatment commenced while arrangements were made to return Pouliot to the group home for hospice care. After recording some early discomfort, Dr. Caldicott's notes of December 25 indicate that, by late in the day, Pouliot was "resting comfortably" with her family by her side. On December 27, however, after

observing that Pouliot appeared dehydrated, Dr. Caldicott wrote:

I have been ordered by the State of N.Y. to provide resuscitative measures. This is against the family's wishes and is causing much strife. However, I will proceed [with] IV fluids and IV antibiotics (even though they are of questionable benefit in cases of aspiration pneumonia). She is comfortable and in no respiratory distress.

Blouin contends that this note documents the AG's office's intervention into Pouliot's care, and she characterizes this intervention as a unilateral direction. The AG's office, on the other hand, maintains that it merely rendered legal advice following inquiries from hospital officials about the appropriate treatment for Pouliot. To the extent there is a factual dispute, on the AG's office's summary judgment motion, Blouin's version must be credited.[1] It is the state's intervention-which Blouin attributes to the AG's office-into the previously agreed-upon course of final care for Pouliot that gave rise to this lawsuit. Blouin's central constitutional claim is that this intervention, without the consent of her sister or a surrogate decisionmaker, caused unwarranted and unnecessary pain and suffering and violated her sister's right to bodily integrity, protected by the Fourteenth Amendment.

The modified treatment measures resulted in more discomfort and deteriora-tion. On December 28, for example, Dr. Caldicott noted that although Pouliot "appears less comfortable," she would continue to administer fluids and antibiotics "as ordered by counsel." The next day she noted that Pouliot "appears very uncomfortable—grimacing mostly [with] occasional grunts" and that she "[w]ill need to re-assess utility or futility of continued antib[iotics], fluids and [oxygen] for this condition." On the 30th, Dr. Caldicott wrote, "Although I believe continued antib[iotics] are futile, I am directed to continue them by other authorities."[2] Pouliot's family was traumatized by this shift in her medical treatment.

Throughout her life, Pouliot was never legally competent to make medical decisions, so they were made by her mother until she contracted Alzheimer's Disease and no longer had the capacity to do so. Under New York law, for persons 18 years of age or older lacking capacity to consent to medical treatment, "informed consent to such ... treatment shall be obtained from a guardian lawfully empowered to give such consent, an actively involved spouse, an actively involved parent, an actively involved adult child, a surrogate decision-making committee or a court of competent jurisdiction." 14 N.Y.C.R.R. § 633.11(b) (2003). After Pouliot's mother became incapacitated, since Pouliot did not have a spouse, other parent, adult child, or other individual authorized to make treatment

---

1. Thurlow avers that he did not order the administration of artificial nutrition and antibiotics but merely rendered a legal opinion about who was, and who was not, authorized to consent to the withdrawal of life-sustaining medical treatment under New York law. But Dr. Caldicott's reference to an order by the "State of [New York]" would seem to refer to the AG's office. We also note that the AG's office's explanation of its initial participation has changed during the course of this litigation. As Blouin points out, before the district court, the AG's office disclaimed *any* partic-ipation-even the rendering of advice-until after hydration, nutrition, and antibiotics had been readministered. *See* Reid Aff. Opp. S.J. at 3.

2. A psychiatric consultation note from December 30, evaluating Pouliot's competency, noted that "[t]he medical team reports that the patient's prognosis is poor with longevity estimated at a few days to weeks with comfort/hospice care or one year with full measures."

decisions on her behalf, no one was authorized to make them.

Recognizing this, the AG's office commenced a proceeding on December 30 in Supreme Court, Onondaga County, seeking the appointment of a temporary guardian *ad litem* pending the appointment of a permanent guardian.[3] That same day, the court appointed Gerald J. Neri, Esq., guardian *ad litem*. Notwithstanding Neri's appointment, however, the AG's office took the position that no one other than a competent patient could decide to withhold nutrition and hydration and that, consequently, both Neri and the court were "without authority to terminate or direct the termination or the continued withholding of nutrition and hydration." Tr. of Dec. 30, 1999 at 31–32. On January 3, 2000, after hearing argument over the appropriate course of care, the court ordered "that all medical treatment for Sheila Pouliot be terminated, except for nutrition as tolerated, [and] palliative hydration care, based on the best interest of the patient." Order of Jan. 3, 2000 at 3.

The next day, Blouin commenced a proceeding in state court on behalf of Pouliot and her family seeking permanently to enjoin the state and the AG's office from providing additional nutritional sustenance to Pouliot. An attending physician, Karen K. Heitzman, M.D., averred in support of this application that Pouliot's condition was terminal and that death was imminent. Dr. Heitzman also stated that nutritional sustenance would require invasive medical procedures "caus[ing] increased pain and suffering," along with the risk of "infection, fractured bones, and thrombosis," "without any measurable medical benefit," and, finally, that such efforts "will not . . . improve her state of health or prolong her life." This assertion was uncontradicted. The court enjoined the hospital from providing nutrition unless approved by Neri.

A few days later, following a meeting at the hospital attended by Thurlow, Neri, and Pouliot's physicians and family members, including Blouin, a new agreement was reached that provided for the administration of fluid and intravenous nutrition by dextrose solution. Blouin, who was represented by counsel at the meeting and who agreed at the time to artificial nutrition and hydration for her sister, now claims to have been subjected at the meeting to "extraordinary pressure and duress" from the state's lawyers, including "express and specific importuning" by Thurlow that she accede to the administration of some kind of caloric feeding to Pouliot. On January 7, 2000, the parties appeared in state court to vacate the TRO on the basis of the agreement, which was reviewed and approved by the court. The treatment was initiated the next day and continued through January and February.

By late February, however, it was apparent to Pouliot's physicians that this treatment was causing her intense pain without medical benefit and was, in fact, worsening her condition. One of Pouliot's

3. Blouin challenges both the motivation underpinning this action and its propriety. She asserts that Thurlow preemptively commenced the proceeding after learning that her counsel intended to move for her appointment as Pouliot's guardian. Blouin also contends that the appointment of a guardian *ad litem* was legally improper, as such appointment is not for medical treatment decisions but for the representation of a disabled individual in court proceedings. *See* N.Y. C.P.L.R. 1202(a) (McKinney 1997). The AG's office, Blouin notes, never sought the appointment of a guardian to authorize its medical intervention into Pouliot's medical care. Its position was that since no one could consent to the withdrawal of life-prolonging nutrition and hydration, no consent was needed before it could be administered.

physicians, Dr. David F. Lehman, wrote in a progress note:

> The intravenous fluids promote that the patient is kept alive for her own body to consume/eat itself. Therefore, this current plan of IV hydration promotes an *INCREASE* in patient suffering, does not promote life quality and maintains her heart/lung capacity only. And, indeed, therefore this current [treatment] is clearly outside of acceptable medical bounds, in effect worsening her condition since she is consuming herself calorically. It is thus, *not* medically indicated.[4] (emphasis in original).

As a result, Pouliot's family returned to court on March 1, 2000, seeking to revisit the treatment plan previously agreed to and, in particular, to stop the intravenous hydration Pouliot was being provided.[5] The AG's office continued to oppose this request, despite uncontroverted testimony that Pouliot's care was medically inappropriate and was causing her significant pain. During this period, its position continued to be that, since Pouliot was never competent to express her intentions, no one had the authority to instruct that the administration of nutrition and/or hydration be stopped.

After noting that the applicable law was unclear and expressing frustration about the unavailability of a surrogate decision-making committee envisioned by New York law,[6] the court determined that it was in Pouliot's best interest to have the treatment modified to terminate hydration but to continue intravenous pain medication. The court thereby authorized the treatment that Pouliot's physicians had previously testified was medically appropriate, but which the AG's office had opposed. Indeed, throughout these proceedings the AG's office has never asserted that the treatment it insisted upon was medically, as opposed to legally, appropriate. The court requested the AG's office to not immediately appeal the order-which would trigger an automatic stay-mentioning its personal observations of the pain that Pouliot was experiencing, but an appeal was filed nevertheless.

On March 3, the Appellate Division temporarily vacated the automatic stay, pend-

---

4. Another of Pouliot's physicians, ethics consultant Dr. Kathy Faber–Langerdoen, wrote: [Pouliot's] gut cannot accept artificial feedings at this point, and her bowel sounds remain absent, indicating that her gut is not functioning .... Sheila is edematous, with total body bloating from hydration in the absence of protein. Hydration alone has resulted in severe protein malnutrition, which is typified by skin, peripheral muscle, and cardiac muscle breakdown. She will die a slow and lingering death from protein malnutrition. From an ethical standpoint, I believe this continued treatment, however well intentioned, is now inhumane and is causing suffering. From a medical standpoint, it is outside of the bounds of what I consider to be medically indicated care.

5. Doctors had been unable to administer nutrition to Pouliot and were administering only hydration, in the form of a sugar/salt water solution, and pain medication.

6. In 1985, the New York State legislature enacted Mental Hygiene Law Article 80, providing for the creation of surrogate decision-making committees to make health care decisions for incompetent residents of state mental hygiene facilities who lack legal guardians. These decisions were to be made based on the best interests of the patient as well as the patient's personal beliefs and values. *See* N.Y. Mental Hyg. Law §§ 80.01, 80.03, 80.07 (McKinney 1996). Unfortunately, a committee had not been established in Onondaga County and thus none was available to Pouliot. Indeed, it appears that these committees had never been established for large portions of the State. *See In re Dreythaler*, 183 Misc.2d 307, 702 N.Y.S.2d 799, 801 (2000) (observing that "[i]nexplicably, ... a committee has never been established for the western part of New York State").

ing a March 6 hearing on a motion to vacate it. On March 3, the hospital ceased hydration. On March 6, Pouliot died.

Blouin sued in New York Supreme Court, Onondaga County, under 42 U.S.C. § 1983 alleging violations of Pouliot's rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments, as well as state-law claims of negligence, unlawful practice of medicine, assault and battery, and infliction of emotional distress.[7] The AG's office removed the action to the Northern District of New York and moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court converted the motion into one for summary judgment. The AG's office argued that Spitzer and Thurlow were entitled to absolute immunity and, if not, qualified immunity, since their conduct violated no clearly established federal law.

The district court granted the motion. It denied Spitzer and Thurlow absolute immunity because:

> [their] actions began prior to the commencement of any judicial proceeding and they were not pursuant to any statutory obligation. Additionally, defendants['] initial actions-providing legal advice to University Hospital-are neither part of a prosecutor's traditional functions nor are they closely associated with the judicial process.

*Blouin v. Spitzer,* 213 F.Supp.2d 184, 190 (N.D.N.Y.2002). The court did, however, determine that they were entitled to qualified immunity, because "plaintiff has failed to allege a violation of a clearly established right. Assuming *arguendo* that the court found a violation, it could not be concluded that such a right was so clearly established that it was objectively unreasonable for defendants to believe that their actions did

not violate the law." *Id.* The court also granted judgment for the AG's office on Blouin's state-law claims. This appeal from the dismissal of the § 1983 claim and the state-law battery claim followed.

## DISCUSSION

We review a district court's grant of summary judgment *de novo. Schnabel v. Abramson,* 232 F.3d 83, 86 (2d Cir.2000). Summary judgment is appropriate when the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 90 (2d Cir.2002). In assessing whether the moving party has made this demonstration, we review all evidence and draw all inferences in the light most favorable to the non-moving party. *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 101 (2d Cir.2001).

### I. Absolute Immunity

■ The AG's office argues that Spitzer and Thurlow are entitled not simply to qualified immunity but to absolute immunity under § 1983, because their challenged actions all involved their "functions and conduct as government advocates representing their state clients." Appellee Br. at 20. We are not persuaded that absolute immunity extends this far under federal law.

■ "[A]bsolute immunity is of a rare and exceptional character." *Barrett v. United States,* 798 F.2d 565, 571 (2d Cir. 1986) (quotation marks omitted). It involves a historical inquiry: "some officials perform 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from

---

7. Blouin has since withdrawn her Fifth and Eighth Amendment claims.

damages liability." *Buckley v. Fitzsimmons,* 509 U.S. 259, 268–69, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (quoting *Butz v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). In determining whether state officials are entitled to absolute immunity, courts employ a "functional approach," *see, e.g., Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), looking at "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Accordingly, state prosecutors are absolutely immune from claims arising from conduct "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

 An official seeking absolute immunity bears the burden of showing that it is warranted for the function in question, against a presumption that qualified immunity affords sufficient protection. *Burns,* 500 U.S. at 486–87, 111 S.Ct. 1934. In considering whether this showing has been made, we look first to whether there is historical or common-law support for cloaking the challenged actions with absolute immunity. *See id.* at 492–93, 111 S.Ct. 1934. The absence of such support is generally determinative. "Since [§ 1983] on its face does not provide for *any* immunities, we would be going far to read into it an absolute immunity for conduct which was only accorded qualified immunity in 1871," when the statute was enacted. *Malley v. Briggs,* 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (emphasis in original); *see also Tower v. Glover,* 467 U.S. 914, 922–23, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984) ("We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy."). If his-

torical or common-law support exists, we proceed to consider whether absolute immunity is warranted by public-policy factors, notably the risks to the performance of important governmental functions posed in its absence by vexatious litigation. *See Burns,* 500 U.S. at 494, 111 S.Ct. 1934.

As previously observed, Blouin seeks to hold the AG's office liable for intervening into Pouliot's medical care by directing the administration of invasive procedures. Spitzer and Thurlow have not carried their burden of identifying any historical or common-law support for an extension of absolute immunity to such actions. As noted, this absence of support is dispositive. *See, e.g., Buckley,* 509 U.S. at 274 n. 5, 113 S.Ct. 2606 (denying absolute immunity for state actor for fabrication of evidence because "there is no common-law tradition of immunity for it").

The AG's office suggests that the common-law support for the absolute immunity of prosecutors, recognized in *Imbler,* is sufficient. But, under the functional approach, the critical inquiry is not the official position of the person seeking absolute immunity, but the specific action for which that person seeks immunity. Here, the challenged intervention was not prosecutorial, nor was it "intimately associated with the judicial phase of the criminal process." *Imbler,* 424 U.S. at 430, 96 S.Ct. 984; *see also Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001). In other words, in intervening, Spitzer and Thurlow were not performing "functions analogous to those of a prosecutor." *Butz,* 438 U.S. at 515, 98 S.Ct. 2894. Nor are we persuaded that they are entitled to absolute immunity because, as they allege, they were merely providing advice to state officials. Even in the investigative phase of a criminal case, advice by state prosecutors warrants only qualified immunity. *See Burns,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547.

Since it would be anomalous to extend absolute immunity to advice in the civil context, but not the criminal context, we decline to take that step.[8]

The AG's office also argues that, even if Spitzer and Thurlow's initial actions were not entitled to absolute immunity, they are entitled to it once they commenced guardianship proceedings, a form of judicial proceedings. But none of the court proceedings in which they participated were criminal, nor did they require Spitzer and Thurlow to act in a prosecutorial capacity. *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 521, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("Because [the U.S. Attorney General] was not acting in a prosecutorial capacity in this case, the situations in which we have applied a functional approach to absolute immunity questions provide scant support for blanket immunization of his performance of the 'national security function.'"). Nor were Spitzer and Thurlow engaged as advocates for the state in adversarial proceedings, at least in the traditional sense. *Cf. Barrett*, 798 F.2d at 572. In seeking the appointment of a guardian for Pouliot, their principal objective was the protection of her well-being. While the public had an undeniable interest in her treatment, Pouliot's interests were the paramount ones, and the state's were derivative.

In short, Spitzer and Thurlow's challenged actions-even after state-court proceedings commenced-were sufficiently distinct from traditional prosecutorial or even adversarial functions that they are required to show independent historical support for their entitlement to absolute immunity. But they have not done so. The unavailability of absolute immunity in this context does not impose a particularly onerous burden on governmental officials, nor does it inappropriately expose them to vexatious litigation. It simply means that, when considering an intervention into the medical treatment of a gravely ill patient, the AG's office may "have to pause to consider whether a proposed course of action can be squared with the Constitution and laws of the United States." *Mitchell*, 472 U.S. at 524, 105 S.Ct. 2806.

## II. Qualified Immunity

We now consider qualified immunity, which shields a government official acting in an official capacity from suit for damages under § 1983 unless the official "violated clearly established rights of which an objectively reasonable official would have known." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir.2003). The determination generally involves a two-step inquiry: do the facts alleged show the officer's conduct violated a constitutional right, and, if so, was the right in question

8. The AG's office also argues that Spitzer and Thurlow are entitled to absolute immunity because, in advising state officials, they were performing "quasi-judicial" functions. In support, it relies primarily on two Seventh Circuit decisions from the 1980s: *Mother Goose Nursery Schools v. Sendak*, 770 F.2d 668, 675 (7th Cir.1985) (holding that "when reviewing proposed contracts for the state, the Indiana Attorney General is performing a quasi-judicial function and his conduct thereunder is entitled to absolute immunity from prosecution for damages under Section 1983"), and *Henderson v. Lopez*, 790 F.2d 44, 47 (7th Cir.1986) (extending absolute immu-nity to Assistant AG for advice given to county officials). That authority, however, was undercut by *Buckley* and *Burns*, the latter of which reversed the Seventh Circuit's determination, relying on these cases, that a prosecutor was entitled to absolute immunity for giving legal advice to the police. Most notably, *Burns* and *Buckley* reaffirmed the requirement of common-law support for the application of absolute immunity, which the AG's office has failed to satisfy. The quasi-judicial rationale, therefore, is unavailing for Spitzer and Thurlow-at least under federal law; under state law, this rationale is more persuasive. *See infra.*

clearly established? *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

The district court bypassed *Saucier*'s first step. It did not make clear whether it believed Blouin failed to allege the violation of a constitutional right. Instead, it concluded that, even if she had, the right was not sufficiently established to make Spitzer and Thurlow's actions objectively unreasonable. *Blouin*, 213 F.Supp.2d at 190. But, as elaborated below, it reached the correct result.

## A. Fourteenth Amendment Liberty Interest

█ Although Blouin presents several bases for § 1983 liability, her central and strongest claim asserts a violation of Pouliot's liberty interest protected by the Fourteenth Amendment. She argues that it is "axiomatic that a never-competent person has constitutional interests in avoiding medical intrusions that would needlessly prolong the dying process." While Blouin is right to assert that the Constitution supports a right to reject life-sustaining medical treatment as a function of the fundamental right to bodily integrity under the Due Process Clause, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 281, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), it does not follow from this, as Blouin argues, that an incompetent person whose death is imminent has a constitutional right to have a surrogate make critical medical decisions, including a decision to withdraw life support. While the former proposition finds support in case law, the latter does not and, as a consequence, is not "clearly established."

█ In *Cruzan*, the Supreme Court held that a state could constitutionally condition the withholding of life-sustaining treatment of an incompetent patient on whether or not the patient, when compe-

tent, had manifested a clear and convincing intention that such treatment be withheld. *Cruzan*, 497 U.S. at 284, 110 S.Ct. 2841. Indeed, if the patient's intention had never been made clear, "a State may properly decline to make judgments about the 'quality' of life that a particular individual may enjoy, and simply assert an unqualified interest in the preservation of human life." *Id.* at 281–82, 110 S.Ct. 2841. As a corollary, where a patient's intention is unclear or non-existent, a state may properly disregard the wishes of a patient's family simply because "there is no automatic assurance the view of close family members [would] necessarily be the same as the patient's would have been had she been confronted with the prospect while competent." *Id.* at 286, 110 S.Ct. 2841. Furthermore, the Court noted that "we do not think the Due Process Clause requires the State to repose judgment on these matters with anyone but the patient herself." *Id.*

*Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), shed additional light on *Cruzan*. There, the Court held that the Constitution did not prevent a state from banning medical professionals and others from assisting in the suicide of terminally ill patients. *Id.* at 735, 117 S.Ct. 2258. In so holding, the Court was careful to cabin *Cruzan*, explaining that that case did not guarantee a right to die, but rather clarified that *Cruzan* only guaranteed competent persons a constitutionally protected right to refuse lifesaving hydration and nutrition. *Id.* at 722–23, 117 S.Ct. 2258 (internal quotations and citations omitted). It would be wrong, therefore, to characterize *Cruzan*, as Blouin does, as "reflecting a general tradition of self-sovereignty." *Id.* at 724, 117 S.Ct. 2258 (citation omitted). On the contrary:

The right assumed in *Cruzan* ... was not simply deduced from abstract concepts of personal autonomy. Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions. The decision to commit suicide with the assistance of another may be just as personal and profound as the decision to refuse unwanted medical treatment, but it has never enjoyed similar legal protection.

*Id.* at 725, 117 S.Ct. 2258. In sum, "[t]hat many rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." *Id.* at 727, 117 S.Ct. 2258.

■■■ In *Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997), the companion case to *Glucksberg,* the Supreme Court upheld the constitutionality of a New York law banning assisted suicide. In so doing, the Court again held that a right to refuse medical treatment does not rest upon "a general and abstract right to hasten death, but on well-established, traditional rights to bodily integrity and freedom from unwanted touching." 521 U.S. at 807, 117 S.Ct. 2293 (citation and internal quotation marks omitted). That is, the right is squarely grounded in the act of consent: "Everyone, regardless of physical condition, is entitled, *if competent,* to refuse unwanted lifesaving medical treatment ...." *Id.* at 800, 117 S.Ct. 2293 (emphasis added).

Through these subsequent decisions, *Cruzan* has been narrowly confined. The Supreme Court has taken pains to avoid expanding *Cruzan* beyond the context of the right of a competent person to refuse lifesaving medical treatment. The Court has explicitly refused to recognize any personal right to an assisted suicide and has noted that the personal autonomy rationale employed here does not create new substantive rights entitled to protection under the Due Process Clause.

Blouin notes that Nancy Cruzan was "a formerly competent patient mired in a permanently unconscious state; her condition had been stabilized, her life was preservable for years, and she was insensate and therefore *not* subject to pain and suffering (facts far different from Sheila Pouliot's)." Appellant Br. at 34 (emphasis in original). Blouin asserts that Sheila's imminent death implicated a "right to avoid unwanted treatment that prolongs a tortuous dying process." Appellant Br. at 28. We find this rationale unconvincing. While *Cruzan* is the only decision that comes even close to recognizing the federal constitutional right that Blouin must show to be clearly established to defeat the defense of qualified immunity, *Cruzan* rests neither on the imminence of death nor on whether Nancy Cruzan was suffering great pain. As we have seen, it rests solely on the patient's capacity to express her intention regarding the course of her medical treatment; a capacity that Nancy Cruzan once possessed but that Sheila Pouliot never did. We therefore do not accept Blouin's assertion that Pouliot's "fundamental liberty interest entitled [her] to shape the course of medical intervention in her dying process—to decide how much bodily invasion to tolerate, how much to suffer, and how much to struggle against unavoidable, imminent death." Appellant Br. at 24. Sheila Pouliot *simply lacked the* capacity to do any of these things. Further, Blouin's arguments supporting a right to a surrogate decisionmaker are based on a number of state decisions. Whatever their merits, they have no bear-

ing on whether such a right exists as a matter of federal constitutional law. In sum, Blouin has not demonstrated that clearly established federal law barred the defendants from effectuating the state's interest in prolonging the life of one of its citizens, whatever its quality.

Therefore, we hold that the defendants are entitled to qualified immunity with respect to Blouin's 42 U.S.C. § 1983 claim.

## B. Remaining Federal Claims

Blouin also asserts a violation of Pouliot's First Amendment right to privacy, her Fourth Amendment right to be free from unreasonable seizures, and her Fourteenth Amendment rights to equal protection and procedural due process. We conclude that Spitzer and Thurlow are entitled to qualified immunity on these claims as well, for Blouin has failed to allege facts showing any constitutional violations. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

▇▇▇ Blouin argues that the AG's office violated Pouliot's First Amendment right to make important decisions concerning her medical treatment, citing the Supreme Court's observation in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), that the First Amendment right to privacy includes "the interest in independence in making certain kinds of important decisions." *Id.* at 599–600, 97 S.Ct. 869. Although numerous state courts have relied on a generalized right to privacy in finding a right to refuse life-sustaining treatment, *see, e.g., In re Grant,* 109 Wash.2d 545, 553 & n. 1, 747 P.2d 445 (1987); *Sup't of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 739–40, 370 N.E.2d 417 (1977); *In re Quinlan,* 70 N.J. 10, 38–40, 355 A.2d 647 (1976), the Supreme Court has made clear that claims concerning unwanted medical treatments are properly analyzed "in terms of a Fourteenth Amendment liberty interest," rath-

er than in terms of a privacy interest. *Cruzan,* 497 U.S. at 279 n. 7, 110 S.Ct. 2841. The district court, therefore, properly granted the AG's office judgment on this claim.

▇▇▇ Blouin argues that the AG's office violated Pouliot's Fourth Amendment rights when they "willfully and unreasonably seized and detained [her] in order to physically subject her to unconsented invasive medical treatment, without a guardian or Court order in place to do so." Appellant Br. at 53. In order to prevail on such a claim, she must establish both that there was a "seizure" and that the seizure was "unreasonable." *Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

Blouin has not established that Pouliot was seized. In *Brower,* the case upon which she principally relies, the Supreme Court stated that a seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 597, 109 S.Ct. 1378 (emphasis removed); *see also United States v. Madison,* 936 F.2d 90, 95 (2d Cir.1991) (same). Blouin has identified no seizure under the facts alleged. Pouliot's "presence in the confined environment in this case" was not the result of the AG's office's actions, *Madison,* 936 F.2d at 95, nor were its actions intended to restrain Pouliot's freedom of movement. *Cf. Medeiros v. O'Connell,* 150 F.3d 164, 168 (2d Cir.1998). The AG's office neither compelled Pouliot's presence in the hospital nor administered the challenged treatment for any reason other than to prolong Pouliot's life. Accordingly, we conclude the district court properly dismissed this claim.

▇▇▇ Blouin makes two equal protection claims. First, she argues that Pouliot, as a mentally disabled individual, was treated differently while receiving palliative care

than she would have been if mentally competent. More specifically, Blouin claims that Pouliot was not permitted to have artificial nutrition, hydration, and antibiotics withdrawn as part of her palliative care, an option she would have had if she had been mentally competent. This argument, however, is essentially foreclosed by the Supreme Court's rejection of a similar claim in *Cruzan:*

> Petitioners also adumbrate in their brief a claim based on the Equal Protection Clause of the Fourteenth Amendment to the effect that Missouri has impermissibly treated incompetent patients differently from competent ones, citing the statement in *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), that the Clause is "essentially a direction that all persons similarly situated should be treated alike." The differences between the choice made *by* a competent person to refuse medical treatment, and the choice made *for* an incompetent person by someone else to refuse medical treatment, are so obviously different that the State is warranted in establishing rigorous procedures for the latter class of cases which do not apply to the former class.

*Cruzan,* 497 U.S. at 287 n. 12, 110 S.Ct. 2841 (emphases in original).

Blouin's second equal protection claim is that the AG's office has acted inconsistently in obtaining consent for medical treatment of mentally disabled individuals. She alleges that although it did not seek consent in this case before directing the treatment, it has sought consent in other situations in which incompetent patients required major medical treatment. In support, she points to *In re Dreythaler,* 183 Misc.2d 307, 702 N.Y.S.2d 799 (2000), which arose after the AG's office had sought judicial consent to administer a dental procedure to a mentally incompetent patient in state care. But, as the district court observed, "[t]here is a tremendous difference between decisions involving dental treatment and [those involving] the termination of life-sustaining treatment." *Blouin,* 213 F.Supp.2d at 196. Again, the Equal Protection Clause does not prevent a state from handling these very different circumstances differently. *See Cruzan,* 497 U.S. at 287 n. 12, 110 S.Ct. 2841. Accordingly, the district court properly granted judgment to the AG's office on Blouin's equal protection claims.

■ Blouin also makes a procedural due process claim, relying on a line of Supreme Court decisions involving the liberty interest of inmates in avoiding disciplinary confinement. Citing *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), in which the Court held that states could create a protected liberty interest by enacting regulations "us[ing] language of an unmistakably mandatory character," *Hewitt,* 459 U.S. at 471, 103 S.Ct. 864; *Harper,* 494 U.S. at 221, 110 S.Ct. 1028 (quoting *Hewitt*), Blouin contends that Pouliot's constitutional rights were violated by the State's failure to follow its own statutory procedures for obtaining consent. The *Hewitt* framework, however, is not applicable to Blouin. First, it was largely abandoned by the Supreme Court in *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), in which the Court observed that, although "States may under certain circumstances create liberty interests which are protected by the Due Process Clause," *id.* at 483–84, 115 S.Ct. 2293, such "interests will be generally limited to freedom from restraint [that] ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents

of prison life," *id.* at 484, 115 S.Ct. 2293. *See also Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003).

 In any event, Blouin's procedural due process claim has a more fundamental flaw. She argues that state procedures for obtaining consent create a substantive liberty interest, but the state procedures, in fact, serve merely to protect the substantive, federal liberty interests of bodily integrity and informed consent. State procedures designed to protect substantive liberty interests entitled to protection under the federal constitution do not themselves give rise to additional substantive liberty interests. *See Holcomb,* 337 F.3d at 224; *Watson v. City of N.Y.,* 92 F.3d 31, 37–38 (2d Cir.1996); *see also Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). The true liberty interest involved here is the right to bodily integrity, not some narrow right shaped by the intricacies of New York's guardianship law. And federal law, not state regulations, determines the procedures necessary to protect that liberty interest. *See Watson,* 92 F.3d at 38. Accordingly, the AG's office was properly granted judgment on this claim.

## C. State Claims

 Blouin also brought an assortment of pendent state-law claims, but on appeal contests only the district court's dismissal of her battery claim.[9] She asserts that, by directing the medical intervention without obtaining authorization by a surrogate decisionmaker, the AG's office committed battery. Under New York law, battery is an "intentional wrongful physical

contact with another person without consent." *Girden v. Sandals Int'l,* 262 F.3d 195, 203 (2d Cir.2001) (citation and quotation omitted). The AG's office contends that, under New York law, Spitzer and Thurlow are entitled to absolute immunity for this conduct and that, in any event, their intervention was not wrongful.

 Under New York law Spitzer and Thurlow are indeed entitled to absolute, and not merely qualified, immunity on this claim. Government officials are generally entitled to absolute immunity under New York law for "quasi-judicial" conduct-conduct performed as part of their official duties and involving the exercise of discretion. *See Tango v. Tulevech,* 61 N.Y.2d 34, 40–42, 471 N.Y.S.2d 73, 459 N.E.2d 182 (1983). The New York Court of Appeals has explained:

> The absolute immunity for quasi-judicial discretionary actions is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability.
>
> Whether an action receives only qualified immunity, shielding the government except when there is bad faith or the action taken is without a reasonable basis, or absolute immunity, where reasonableness or bad faith is irrelevant, requires an analysis of the functions and duties of the particular governmental official or employee whose conduct is in issue. The question depends not so much on the importance of the actor's

---

9. Although mentioning her other state-law claims, *see* Pl. Br. at 55, Blouin provides no argument concerning them. Consequently, we consider them abandoned. *See Taylor v. Rodriguez,* 238 F.3d 188, 196–97 (2d Cir. 2001) ("[Plaintiff] includes in his appellate

brief no argument regarding [certain claims]. Consequently, we deem these claims abandoned."). *See also Sioson v. Knights of Columbus,* 303 F.3d 458, 460 (2d Cir.2002) (per curiam).

position or its title as on the scope of the delegated discretion and whether the position entails making decisions of a judicial nature—i.e., decisions requiring the application of governing rules to particular facts, an "exercise of reasoned judgment which could typically produce different acceptable results."

*Arteaga v. State*, 72 N.Y.2d 212, 216, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988) (citations omitted).

Applying this test, we conclude that Spitzer and Thurlow are entitled to absolute immunity because their conduct involved the exercise of discretion concerning the application of New York law. *See id.* at 217, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (discussing cases); *see also Gerson v. N.Y. State Attorney Gen.*, 139 A.D.2d 617, 527 N.Y.S.2d 258, 258 (2d Dep't 1988) (finding that "claimant's allegations ... involve the exercise of discretion by the Attorney–General to which governmental immunity attaches").

■ Even if the defendants were not entitled to absolute immunity, we hold that they are entitled to qualified immunity under state law as to Blouin's battery claim. The New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis. *Arteaga*, 72 N.Y.2d at 216, 532 N.Y.S.2d 57, 527 N.E.2d 1194; *Friedman v. State*, 67 N.Y.2d 271, 284, 502 N.Y.S.2d 669, 493 N.E.2d 893 (1986). Here, Blouin makes no allegation of bad faith on the part of the government. Further, the New York courts have not held that a battery claim may be based upon a common law right on the part of a never-competent individual to have decisions regarding life-sustaining medical treatment made by a surrogate.

In *Matter of Storar*, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, *cert. denied*,

454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981), the New York Court of Appeals considered consolidated appeals concerning Joseph Fox and John Storar. In considering the case of Fox, who became incompetent at the age of 83, the Court held that the long-recognized common law right to decline medical treatment applied to an incompetent patient who, when competent, had clearly expressed a desire that medical procedures that would merely postpone imminent death not be employed. In *Matter of O'Connor*, 72 N.Y.2d 517, 534 N.Y.S.2d 886, 531 N.E.2d 607 (1988), the Court of Appeals explained that because the required clarity had not been present in the case of John Storar:

> we declined to direct termination of the treatment because it was impossible to determine what [Storar's] wish would have been were he competent and it would be improper for a court to substitute its judgment for the unascertainable wish of the patient. Commenting on this latter principle in a subsequent case we noted that the right to decline treatment is personal and, under existing law in this State, could not be exercised by a third party when the patient is unable to do so

*Id.* at 890–91 (citing *People v. Eulo*, 63 N.Y.2d 341, 482 N.Y.S.2d 436, 472 N.E.2d 286 (1984)). The *O'Connor* court further explained why "no person or court should substitute its judgment as to what would be an acceptable quality of life for another" and why therefore "the inquiry must always be narrowed to the patient's expressed intent":

> Every person has a right to life, and no one should be denied essential medical care unless the evidence clearly and convincingly shows that the patient intended to decline the treatment under some particular circumstances. This is a demanding standard, the most rigor-

ous burden of proof in civil cases. It is appropriate here because if an error occurs it should be made on the side of life.

*Id.* at 892 (citations omitted).

Blouin contends that *Storar* and *O'Connor* do not control because *Storar* explicitly left open the question of a never-competent patient's right to have medical care declined on her behalf when the prolongation of life would cause pain and suffering. But this contention is irrelevant. In order to defeat a claim of qualified immunity, Blouin must show that the challenged governmental actions lacked a reasonable basis. Given that *Storar* and *O'Connor* are based upon an individualized determination regarding the "fundamental question—the patient's desires." *O'Connor*, 534 N.Y.S.2d at 893, 531 N.E.2d 607, and not the desires of surrogates or family members, it is clear that there is no basis for a claim that the government action lacked a reasonable basis. The concession that these cases did not explicitly consider the right of a never-competent patient to decline treatment, and that the question has therefore been left open, is an implicit admission that this area of law is far from settled. Thus, the District Court properly concluded that the Attorney General's Office was entitled to qualified immunity on Blouin's battery claim.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.