*582 OPINION OF THE COURT
Eugene E. Peckham, J.
This is a petition to modify a previous order of the Supreme Court, Tompkins County, in which D.P., as the mother of B, was appointed as guardian of the person and property of B pursuant to article 81 of the Mental Hygiene Law. In that order dated June 28, 1993, the court stated in the last paragraph: “no decision shall be made with respect to the permanent sterilization of said B, by tubal ligation or otherwise, nor shall any such permanent sterilization be carried out, without further order of this Court, after hearing and appointment of a law guardian for said B.”
The current petition seeks to modify the prior order by granting permission for B to undergo a tubal ligation. The court has appointed counsel for B, appointed Mental Hygiene Legal Service as court evaluator and also directed an independent psychological examination of B to determine her capacity to give informed consent to the proposed procedure.
B is presently 26 years old and resides in a supervised apartment operated by X, a not-for-profit corporation, whose facilities are licensed by the New York State Office of Mental Retardation and Developmental Disabilities (OMRDD). She has Down’s syndrome and is mildly to moderately retarded with an IQ of approximately 62. She has suffered episodes of depression in the past and has threatened to hurt herself. She has been employed for about four years in the laundry of a local hotel. She performs most activities of daily living, but her medications and finances are supervised by X.
B herself testified that she is sexually active and her gynecologist testified she is capable of bearing a child. B also testified that she wants to have the tubal ligation so she would not have a baby. Asked whether or not she wanted to have a baby she testified: “No, because it’s too much to handle and a lot of responsibility and a hard time. Sometimes I work too, and I don’t have time to get up early in the morning and nighttime, if I take care of babies, that’s hard for me to do that.”
B’s gynecologist also testified that if B were to have a baby there would be a 50% chance of the child being bom disabled due to B’s chromosome problems and that “raising a handicapped child would probably affect her depression and make it more difficult for her to cope with her life.”
The first question is whether B has the capacity to decide for herself whether or not to have the tubal ligation. Adult females *583 who are not incapacitated make that decision for themselves every day. As stated by Judge Cardozo, “Every human being of adult years and sound mind has a right to determine what will be done with his own body.” (Schloendorff v New York Hosp., 211 NY 125, 129 [1914], overruled on other grounds by Bing v Thunig, 2 NY2d 656 [1957].)
B’s gynecologist, psychiatric social worker, and mother each testified that B understands the significance of a tubal ligation and is capable of consenting to it. B herself testified it is what she wants to do. She also testified she has discussed the matter with “my mom, my staff and my Doctor” and has read a book about birth control.
The only witness who testified to the contrary was Dr. F, the independent psychologist appointed by the court. Dr. F filed a report and testified that based on the criteria he used in examining B he did not find her competent to make a decision regarding tubal ligation. He also testified on cross-examination that if B was able to explain various methods of birth control and why she chose tubal ligation over other methods it would change his opinion as to her capacity.
The court evaluator also testified and filed a report in which she recommended that the petition be granted and that B be permitted to have the tubal ligation. After Dr. F testified she testified in rebuttal and stated regarding B: “Today she’s testified as to her reasons for wanting a tubal ligation, and she’s also testified to the advantages and disadvantages of several other types of birth control. So based on that, I would still recommend the procedure.”
The second question is whether the court can authorize B’s mother as her article 81 guardian to consent to the tubal ligation on behalf of her daughter.
A number of cases have held the court does have the power to authorize B’s mother as her guardian to consent to the procedure on B’s behalf. (Matter of Nilsson, 122 Misc 2d 458 [Sup Ct, Livingston County 1983]; Matter of Sallmaier, 85 Misc 2d 295 [Sup Ct, Queens County 1976]; Matter of X, NYLJ, Mar. 10, 1994, at 1, col 6 [Sur Ct, Erie County]; Matter of Toni Jo H, Sup Ct, Broome County, Dec. 19, 1996; Matter of Grady, 85 NJ 235, 426 A2d 467 [1981]; Estate of C.W., 433 Pa Super 167, 640 A2d 427 [1994]; Matter of Moe, 385 Mass 555, 432 NE2d 712 [1982].) Furthermore, section 81.22 (a) (8) of the Mental Hygiene Law provides that a guardian appointed under article 81 has the power to “consent to or refuse generally accepted routine or major medical * * * treatment” and that the deci *584 sion shall be made “in accordance with the patient’s wishes.” Tubal ligation nowadays is a generally accepted major medical procedure. Millions of women have had the procedure. B testified she wishes to have the procedure.
In Nilsson the court set forth a list of standards to be considered by the trial court in considering a petition for sterilization. The standards are adapted from a similar list in the Grady case from New Jersey. The list is as follows:
“1. possibility that the incompetent or disabled person could become pregnant;
“2. possibility that the incompetent person would experience trauma or psychological damage if she became pregnant or gave birth as considered with the possibility of trauma or psychological damage resulting from sterilization;
“3. the likelihood that the individual would voluntarily engage in sexual activities or be placed in situations where sexual activities might be imposed upon her;
“4. the inability of the incompetent person to understand reproduction or contraception and the likelihood of permanence of that inability;
“5. feasibility and medical advisability of less drastic means of contraception both at the present time and in the foreseeable future circumstances;
“6. the advisability of sterilization at the time of the application as opposed to such a procedure at some future date;
“7. the ability of the incompetent person to care for a child with the possibility that the incompetent person may at some future date be able to marry and, with a spouse, care for a child;
“8. evidence scientific or medical advances may occur within the foreseeable future which might make possible for improvement of the individual’s condition or alternatives in less drastic sterilization procedures;
“9. demonstration that the proponents of the sterilization are seeking it in good faith and that their primary interest is for the best interests of the incompetent person rather than for their own or the public’s convenience.” (Nilsson, supra at 460.)
Applying the Nilsson standards to the present case, B’s gynecologist testified B is capable of becoming pregnant and that “pregnancy and raising a handicapped child would probably affect her depression and make it more difficult for her to cope with her life.” B herself testified she is sexually active. The doctor also testified that tubal ligation is the best alterna *585 tive for B at the present time and that other forms of birth control are not effective for B, and that there are no scientific advances in birth control in the foreseeable future that would permit a less drastic form of birth control. Both the psychiatric social worker and B’s mother testified that she would have great difficulty raising a child, particularly if the child were born under a disability. B herself testified that she could not care for a child. Lastly, since eight years have passed since the issue of a tubal ligation for B was first raised and since all the people regularly involved with B, including B herself, agree that the procedure would be in her best interests, it is clear that the proponents of sterilization are seeking it in good faith. Upon applying the standards adopted in Nilsson the court concludes that the standards have been met and that it is in B’s best interests to authorize the tubal ligation operation.
Two cases decided by the New York courts to the contrary are not applicable here. Matter of D.D. (90 Misc 2d 236 [Sur Ct, Nassau County 1977], affd 64 AD2d 898 [2d Dept 1978], appeal dismissed without op 49 NY2d 916 [1980]) was an early case that held that the surrogate in an article 17-A guardianship proceeding did not have jurisdiction to permit the guardian to consent to sterilization of the ward. As has already been pointed out, article 81 which was adopted subsequently by the Legislature, effective April 1, 1993, does permit a guardian to consent to generally accepted major medical procedures. Thus the Legislature has granted to article 81 guardians powers it possibly may not have granted to article 17-A guardians. Even so, it is doubtful whether the same conclusion would be reached regarding article 17-A guardians today. The equal protection provisions of the Federal and State Constitutions would require that mentally retarded persons in a similar situation be treated the same whether they have a guardian appointed under article 17-A or article 81. The Supreme Court has held there must be a rational basis for any distinctions in the law affecting the mentally retarded. (City of Cleburne v Cleburne Living Ctr., 473 US 432 [1985].) There is no rational basis for saying the ability of a guardian for a mentally retarded person to consent to medical treatment of the ward should differ if the guardian is appointed under article 81 rather than article 17-A.
The Legislature has declared as legislative findings and purpose for article 81 that a person with incapacities should be afforded “the greatest amount of independence and self-determination and participation in all the decisions affecting such person’s life.” (Mental Hygiene Law § 81.01.) Such inde *586 pendence and freedom from government interference in matters of birth control, whether exercised by the person herself, or through a guardian, has been recognized as part of the constitutional right to privacy in such matters. (Griswold v Connecticut, 381 US 479 [1965]; Eisenstadt v Baird, 405 US 438 [1972].) Thus the guardian for a mentally retarded person should have an equal right to consent to a tubal ligation or other major medical procedure no matter whether the guardian was appointed under article 17-A or article 81.
The second case is Matter of Cheryl O. (154 AD2d 895 [4th Dept 1989]), which denied an application by the director of the Newark Developmental Center to have a patient sterilized on the ground that the evidence did not meet the requirements of 14 NYCRR 633.11 (a) (3) (ii). That section of the regulations provides in regard to sterilization that it only “may be performed when medically required to save a person from death or serious physical illness.”
Cheryl O. was an application by the director of a facility for sterilization, here it is not the director of X applying, but rather B herself and her guardian. The Attorney General representing OMRDD has taken the position both at the hearing and in the brief filed herein that the quoted provision of the regulations applies only where the individual for whom sterilization is sought is determined to be incompetent and the licensed facility is the actual petitioner for authorization to permit the procedure. The court agrees that the Attorney General’s position is correct. The initial section of the regulations entitled “Applicability” says “This Part contains requirements applicable to all facilities operated or certified by the Office of Mental Retardation and Developmental Disabilities* * * .”(14 NYCRR 633.1 [c] [emphasis added].) Thus the regulations are applicable only to facilities and not to the individual resident of a facility or her guardian.
The Attorney General takes the further position that the facility’s obligation under the regulations is to insure that the decision has been made in the “best interests” of the individual. The regulations provide that when medical treatment is proposed for which “informed consent” is required “it shall be the duty of the chief executive officer to ensure that the person is personally afforded an appropriate explanation of any proposed professional medical treatment.” (14 NYCRR 633.11 [a] [1] [i].) The regulations further provide that: “Informed consent may be obtained for those persons who are residents of a facility operated or certified by OMRDD as follows * * * *587 from a guardian lawfully empowered to give such consent * * * .” (14 NYCRR 633.11 [a] [1] [iii] [b].) Thus the obligation of the facility has been met when a court of competent jurisdiction issues an order authorizing the guardian of an incompetent individual to consent to a tubal ligation for purposes of sterilization in the best interests of that individual.
In sum, it is the opinion of the court that B has sufficient capacity to give informed consent to the tubal ligation. She wants to have the procedure because she does not believe she could care for a child and to maintain control of her own body. Her social worker and the service coordinator at X both testified that B has progressed and matured since the time of the original order appointing a guardian eight years ago, and her social worker, doctor and mother all testified she understands the implications of her decision. The whole thrust of article 81 guardianship is to make available to incapacitated persons “the least restrictive form of intervention which assists them in meeting their needs but, at the same time, permits them to exercise the independence and self-determination of which they are capable.” (Mental Hygiene Law § 81.01.) In this case the least restrictive intervention is to permit B to decide for herself whether to have the tubal ligation.
Even if B is not capable of giving informed consent, because she has been determined to be incapacitated by the appointment of her mother as guardian and because she resides in an OMRDD licensed facility, the court has determined that it will be in B’s best interests to authorize the tubal ligation. Her mother who is her guardian, her doctor and her psychiatric social worker all so testified. The testimony of Dr. F is undermined by his statement that his opinion would change if B could explain various methods of birth control and why she wants a tubal ligation. In her testimony in court B did answer those questions to the satisfaction of the court evaluator and the court.
By reason of the foregoing, the petition is granted on the ground that B has capacity to give informed consent to the tubal ligation surgery. The order dated June 28, 1993 is modified by striking out the last paragraph quoted above. If required by any medical provider or insurance carrier, D.P., mother and guardian of B, is hereby authorized to consent to the tubal ligation of her daughter.