OPINION OF THE COURT
Philip S. Straniere, J.
Currently before the court is an application of an individual with a disability to have her name legally changed, pursuant to Civil Rights Law article 6. The applicant is a 19-year-old female and has stated sufficient grounds to have her name changed but for the fact that the court has been informed that the applicant is classified as “mentally retarded.” A hearing was held on February 24, 2003 to determine if the applicant was capable of making such a decision on her own. The applicant was accompanied by her natural mother and a case *498 worker from the Seamen’s Society for Children and Families, both of whom support her application.
The Seamen’s Society for Children and Families was appointed the applicant’s guardian in a Family Court proceeding in New York County when she was a minor. Her mother apparently requested assistance and voluntarily placed the applicant in a foster home. Since the applicant has become emancipated as of April 23, 2001, no proceeding has been brought in either Supreme Court pursuant to Mental Hygiene Law article 81, Surrogate’s Court Procedure Act article 17-A, or any other statute to have a guardian appointed for her.
After inquiry by the court, it is clear that the applicant is living as independent a life as is possible for a person with her abilities. She is in school and participates in a work program. She handles her own money, maintains her own bank account and travels the public transportation system without being accompanied. When questioned by the court she clearly articulated the reasons why she wanted to change her name. The applicant stated that in order for her to obtain an identification card from the New York State Department of Motor Vehicles, she is required to formally change her name from the one appearing on her birth certificate to the one she has been using. She has in fact been known by her current name for her entire life and has never used the name of her natural father.
Initially this court wrestled with the problem as to whether or not it could even entertain this application. The applicant is identified in her supporting papers as a “mentally retarded” person whose chronological age allows her to be treated as an adult as she is no longer an “infant” or “minor” under the law (Mental Hygiene Law § 1.03 [26]; CPLR 105 [j]; Social Services Law § 2 [31]). The Mental Hygiene Law defines “mental retardation” as “subaverage intellectual functioning which originates during the developmental period and is associated with impairment of adaptive behavior” (Mental Hygiene Law § 1.03 [21]). If she is already identified as such a person, is this court automatically required to have a guardian appointed for her pursuant to either Mental Hygiene Law article 81, Surrogate’s Court Procedure Act article 17-A or Social Services Law article 9-B? Since none of these acts specifically grants the jurisdiction to the Civil Court to make any such or similar determination, must this name change application be transferred to another court? The only statutory authority for the granting *499 of a “guardian ad litem” is in CPLR 1201 which requires that a guardian ad litem be appointed for “an adult incapable of adequately prosecuting or defending his [her] rights” (Kings 28 Assoc. v Raff, 167 Misc 2d 351, 354 [Civ Ct, Kings County 1995]).*
An analysis of the statutes and the public policy of both this country and state concerning the rights of persons with disabilities requires the court to reject any necessity for a guardian to be appointed in order to afford the applicant the rights which are available to nondisabled persons. Support for this conclusion can be gleaned from the Legislature’s own language in enacting article 81 of the Mental Hygiene Law when it said: “The legislature hereby finds that the needs of persons with incapacities are as diverse and complex as they are unique to the individual * * *. The legislature finds that it is desirable for and beneficial to persons with incapacities to make available to them the least restrictive form of intervention which assists them in meeting their needs but, at the same time, permits them to exercise the independence and self-determination of which they are capable. The legislature declares that it is the purpose of this act to promote the public welfare by establishing a guardianship system which is appropriate to satisfy either personal or property management needs of that person, which takes in account the personal wishes, preferences and desires of the person, and which affords the person the greatest amount of independence and self-determination and participation in all decisions affecting such person’s life” (Mental Hygiene Law § 81.01 [emphasis added]; see also the federal mandate to eliminate “overprotective rules and policies” concerning individuals with disabilities and the resulting “relegation” of such person “to lesser services” and achieve the nation’s goal of “equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals” [42 USC § 12101 (a) (5), (8)]).
Similar efforts to recognize and encourage persons with disabilities to maximize their abilities and participate as fully as possible in society can be found in article 21 of the Education Law, the Vocational Rehabilitation Act, which encourages all persons with disabilities to undergo training to achieve gainful employment, as well as in article 89 of the Education Law, which deals with the education of children with handicapping conditions which mandates that children be placed in the least *500 restrictive educational environment and be mainstreamed into regular education as much as possible.
The obvious intent of these statutes is to allow persons with disabilities to maintain as much control over their own life decisions as they are capable of making. To strip the Judges of the Civil Court and other lower courts of the power to make certain decisions in regard to applications by such individuals makes the public purpose encapsulated in this statute only words. The absurdity of requiring the Civil Court to transfer these cases to other courts is readily apparent but is somewhat negated by the authority granted in CPLR article 12. The Civil Court sees more cases where individuals appear without attorneys than any other court. Judges in the Civil Court are on a daily basis analyzing the responses and demeanor of litigants appearing before them without counsel and making determinations as to whether or not they need a guardian appointed to protect their rights. Article 12 of the CPLR by its terms applies to infants, judicially declared incompetents, persons with Mental Hygiene Law article 81 guardians, and individuals incapable of prosecuting or defending their rights. Nowhere is the Civil Court granted the specific power to engage in the process of conducting an inquiry which would go beyond the litigation needs of a party so as to determine if a litigant should be classified as a judicially declared incompetent or entitled to protection under article 81. On a regular basis such CPLR article 12 guardians ad litem are appointed in Civil Court for persons in need of legal assistance; at the same time the court lacks the power to determine competency or capacity beyond the need for legal assistance, as if these are somehow mutually exclusive.
To require persons like the applicant, who are able to make certain decisions affecting their lives, to go through a process that is unnecessary, time consuming and daunting even to persons who do not suffer from some disability, is contrary to the inherent power of courts to determine what persons need help in protecting their rights and is not based on common sense. The current situation may in fact be violative of the Equal Protection and Due Process Clauses of the United States Constitution. The Legislature granted the Civil Court the jurisdiction to order name changes (Civil Rights Law § 60), and in doing so gave the Civil Court the authority to determine the competency of the petitioner to make the application, and to appoint a guardian ad litem, if necessary, without obligating that person to apply to another court for such a determination *501 only to return to Civil Court for the completion of the relief being sought. In the Mental Hygiene Law, the Legislature sets forth certain procedures to be followed and evidence that is needed in making the determination if a guardian should be appointed. A reading of this statute does not indicate that a judge needs any special training in order to make a decision in that regard.
Further, in support of the idea that guardians should only be appointed in limited situations is the requirement that “[t]he determination of incapacity shall be based on clear and convincing evidence and shall consist of a determination that a person is likely to suffer harm.” (Mental Hygiene Law § 81.02 [b] [emphasis added].) This standard of burden of proof is further evidence that only in unusual circumstances should the court seek the intervention of a guardian. The Legislature rejected the more common burden of proof in civil matters of “preponderance of the evidence” in favor of the more stringent “clear and convincing evidence” standard. This supports a conclusion that the person making the application is presumed capable of making his or her own decision.
As there is no provision in the Civil Rights Law prohibiting a developmentally disabled person from changing his or her name, nor is there a requirement that the parent or guardian make application on behalf of such an adult in a manner similar to that required for infants (Civil Rights Law § 60), the court will grant this application.
The applicant is authorized to change her name.
While the court did not ultimately have to deal with the issue of whether or not the petitioner needed a permanent guardian, in analyzing the applicable law in that regard, it became apparent that a situation exists on Staten Island that requires comment and action taken to remedy it.
As pointed out above, if this court had doubts about the capacity of the applicant to make a decision in regard to the management of her affairs, including changing her name, the Civil Court would have to require the applicant, or some third party on her behalf, to bring a proceeding in either the Supreme Court or Surrogate’s Court. The triggering event under the Surrogate’s Court Procedure Act for the appointment of a guardian for either a mentally retarded person (SCPA 1750 [1]) or a person with developmental disabilities (SCPA 1750-a) is a certification by a person qualified to make such a certification that the person is “incapable to manage him or herself and/or his or her affairs by reason of mental *502 retardation” or “developmental disability.” As there is no evidence before this court that such a certification has been made since the petitioner became an adult, there is nothing to rebut the presumption that she is competent to make this application to change her name.
An examination of Mental Hygiene Law article 81 reveals another anomalous situation that exists as a result of the grant of different subject matter jurisdiction to the various courts of this state. Jurisdiction for article 81 proceedings is in “the supreme court, and the county courts outside the city of New York” (Mental Hygiene Law § 81.04 [a]). This is a grant of authority which must be questioned. When the County Court was abolished in New York City in 1962 those judges became Supreme Court Justices (NY Const, art VI, § 35). The restructuring in 1962 resulted in the civil jurisdiction of the County Courts and the Civil Court of the City of New York as mirroring each other; they became jurisdictional “twins” (see NY Const, art VI, § 11 [County Court]; art VI, § 15 [Civil Court]). In spite of this fact, there are numerous places in New York statutes where the County Court is granted jurisdiction along with the Supreme Court, while the Civil Court does not receive such concurrent jurisdiction (see also Social Services Law art 9-B, “Adult Protective Services,” which requires any order for relief in these situations to be made only in the Supreme or County Court but whose assistance is invoked on a regular basis to protect persons appearing in Housing Court). It should be pointed out that although the State Constitution establishes Civil Court and County Court as jurisdictional twins, the acts specifically defining the respective jurisdiction of the courts reveal that they are more like fraternal than identical twins; a curious result in light of the language of the Constitution. (See Judiciary Law art 7 [County Courts]; New York City Civil Court Act.)
The limitation as to jurisdiction of the courts that can hear these “competency” cases results in a disparity in the treatment of citizens of this state. Residents of counties outside of New York City have the option of bringing an article 81 action in more than one court, while residents of New York City, where there is no County Court, are limited to only one. The difference in filing fees between the Supreme Court and the Civil Court in the City of New York is substantial and the additional costs of bringing a proceeding in Supreme Court might have a “chilling effect” on the ability of persons to make such an application. If such a disparity in filing fees also exists be *503 tween Supreme Court and County Court, then residents of the City are at a disadvantage. In the City of New York only the more expensive forum is available.
In fact, in Richmond County, a more egregious situation exists; there is no part of the Supreme Court sitting in that county which handles article 81 proceedings. Since the statute permits venue for such a part to exist only in the Supreme Court in the “judicial district” (Mental Hygiene Law § 81.04), Staten Islanders have to travel to Brooklyn to have their cases heard. This creates disparate treatment for Staten Islanders. No other area of the state has this situation. Every other county in New York City is its own judicial district. Staten Island alone remains tethered to Kings County under a Byzantine system that serves no useful or public purpose. Even if an upstate judicial district contains several counties, those citizens can apply for relief to the County Court which exists in every county of the state except New York City. As a result, a statute seemingly neutral on its face has a disparate impact on persons with disabilities.
Considering the nature of the relief being sought in an article 81 proceeding, this travel requirement for Staten Islanders in need of this statutory protection can cause a hardship for such applicants, many if not all of whom, because of their impairments, would qualify for protection under laws designed to secure equal rights and access to persons with disabilities. The current system requires the most vulnerable residents of Richmond County to travel to Brooklyn for redress. How many of the applications are made on behalf of the disabled person with that individual never appearing before the judge in Brooklyn because of the transportation hardship involved? The current situation may in fact be in violation of federal law: “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity” (42 USC § 12132). The State, local government and departments and agencies of them which would include the court system are considered “public entities” (42 USC § 12131 [1]).
There are three possible solutions. The first of course is to establish Staten Island as its own judicial district; a morally correct but politically impractical choice. The second would be to amend the Mental Hygiene Law and all other laws where jurisdiction for civil relief is given to the Supreme Court and County Court to include the Civil Court as well. The third, and *504 perhaps the most expeditious one, is for the Office of Court Administration to authorize the opening of a part in Richmond County to handle these article 81 proceedings.
The petition to change her name is granted.

 The court notes that for some reason this section of the CPLR has not been rendered gender neutral as of yet.