[797 NYS2d 510]

In the Matter of M.B. MENTAL HYGIENE LEGAL SERVICE, Appellant; STATEN ISLAND DEVELOPMENTAL DISABILITIES SERVICES OFFICE et al., Respondents.·

Second Department, June 13, 2005

## APPEARANCES OF COUNSEL

*Mental Hygiene Legal Service,* Mineola (*Sidney Hirschfeld, Lisa Volpe* and *Dennis B. Feld* of counsel), appellant pro se.

*Eliot Spitzer, Attorney General,* New York City (*Michael S. Belohlavek* and *Jean Lin* of counsel), for respondent Staten Island Developmental Disabilities Services Office.

*NYSARC, Inc.,* Delmar (*Tania F. Seaburg* and *John F. Von Ahn* of counsel), amicus curiae.

## OPINION OF THE COURT

GOLDSTEIN, J.

By amended decree of the Surrogate's Court, Richmond County, dated January 24, 2003, M.B.'s brother, R.B., was appointed "guardian of the person only" of M.B. The amended decree made no mention of any powers to make health care decisions. Thereafter, M.B. was admitted to Staten Island University Hospital suffering from pneumonia, hypertension, and hypoxia. In early October 2003, he was placed on a respirator for breathing and a nasal-gastric tube for feeding and hydration. On or about October 14, 2003, R.B., as guardian of the person of M.B., requested pursuant to SCPA 1750-b that life-sustaining treatment be withdrawn and withheld from M.B.

SCPA 1750-b is part of the "Health Care Decisions Act for Persons with Mental Retardation" (L 2002, ch 500), effective March 16, 2003. This act of the Legislature also amended SCPA 1750 relating to the appointment of guardians for mentally-retarded persons. SCPA 1750-b (1) provides that "[u]nless specifically prohibited by the court" the guardian for a mentally-retarded person appointed pursuant to SCPA 1750 has the authority to make health care decisions on behalf of the mentally-retarded person which "may include decisions to with-

hold or withdraw life-sustaining treatment" as defined in Mental Hygiene Law § 81.29 (e). Mental Hygiene Law § 81.29 (e) defines life-sustaining treatment as "medical treatment" including "artificial nutrition and hydration" that "is sustaining life functions and without which, according to reasonable medical judgment, that patient will die within a relatively short time period."

The appellant Mental Hygiene Legal Service (hereinafter MHLS) commenced the instant proceeding to determine that R.B. did not have the authority to withhold or withdraw life-sustaining treatment pursuant to SCPA 1750 and 1750-b on the ground that those provisions are not to be applied retroactively to guardians appointed prior to their effective date. MHLS contended that R.B., as guardian of the person of M.B., could "only exercise authority under SCPA 1750-b if his authority is specifically expanded by the Surrogate." The order appealed from (*see Matter of M.B.*, 2 Misc 3d 328, 331), held that the Health Care Decisions Act for Persons with Mental Retardation "applies to all guardians, whether appointed before or after its effective date."

At the outset, we note that the issue of the powers of the guardian for M.B. is now academic, since M.B. died within hours of the termination of life-sustaining treatment. However, in view of a likelihood of the repetition of this issue in the future, the fact that the issue could tend to evade review, and that the questions raised by this appeal are substantial, an exception to the mootness doctrine applies (*see Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]).

The constitutionality of the Health Care Decisions Act for Persons with Mental Retardation is in no way contested on this appeal. The only question before this Court is whether its provisions are to be applied retroactively.

In determining whether the amendments should be applied retroactively, one must examine the legislative intent. "[T]he clearest indicator of legislative intent is the statutory text" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). The retroactive application of statutes is not favored (*see id.* at 584). Substantive statutes which create new rights are generally not applied retroactively; indeed, even statutes which are remedial in nature are not applied retroactively if vested rights would be impaired (*see Matter of Marino S.*, 100 NY2d 361, 371 [2003], *cert denied* 540 US 1059 [2003]; *Alliance of Am. Insurers v Chu*, 77 NY2d 573, 586 [1991]; McKinney's Cons Laws of NY, Book 1, Statutes § 51, at 98-100).

The amendments were enacted to address a problem discussed in the relevant case law. New York case law holds that a competent adult has the right to refuse life-saving medical treatment (*see Matter of Fosmire v Nicoleau*, 75 NY2d 218). When the patient is not competent, a decision to withhold or withdraw life-sustaining treatment may be made if there is clear and convincing evidence that the patient, when competent, did not wish to have his or her life prolonged by medical means with no hope of recovery (*see Matter of Storar*, 52 NY2d 363 [1981], *cert denied* 454 US 858 [1981]). Such a determination can only be made if the patient "had been competent and capable of expressing" his or her wishes at some point (*Matter of Westchester County Med. Ctr. [O'Connor]*, 72 NY2d 517, 529 [1988]). In the case of *Storar*, who was profoundly retarded and was never able to competently express his wishes, the Court of Appeals held that the guardian could not withhold or withdraw life-sustaining treatment (*see Matter of Storar, supra*).

Like all individuals, mentally-retarded persons are not all the same. The levels of mental retardation have been classified as (1) mildly retarded with IQ of 50 to 70, (2) moderately retarded with an IQ of 35 to 50, (3) severely retarded with an IQ of 20 to 35, and (4) profoundly retarded with an IQ below 20 (*Matter of Baby Boy W.*, 3 Misc 3d 656, 666 [2004]). Mentally-retarded persons can be competent to make their own medical decisions (*see Matter of Baby Boy W., supra* at 666; *Matter of B*, 190 Misc 2d 581 [2002] [retarded person with IQ of 62 can give informed consent to sterilization]) and can be capable of pursuing their legal rights without the aid of a guardian (*see Matter of Individual with Disability for Leave to Change Name*, 195 Misc 2d 497 [2003]).

The new SCPA 1750 (2) properly recognizes that there are mentally-retarded persons who are capable of making their own health care decisions. Every certification by two physicians or a physician and a psychologist that the mentally-retarded person is incapable of managing his or her affairs "shall include a specific determination . . . as to whether the mentally retarded person has the capacity to make health care decisions." (SCPA 1750 [2].) A determination by the examining physicians and/or psychologist that the mentally-retarded person is capable of making health care decisions "shall not preclude the appointment of a guardian pursuant to this section to make *other* decisions on behalf of the mentally retarded person" (*id.* [emphasis supplied]).

With respect to guardians appointed prior to the effective date of the new provisions, SCPA 1750 (2) provides that the absence of a determination as to whether the mentally-retarded person has the capacity to make health care decisions "shall not preclude such guardians from making health care decisions." Further, SCPA 1750-b states:

> "Unless specifically prohibited by the court after consideration of the determination, *if any,* regarding a mentally retarded person's capacity to make health care decisions, which is required by section seventeen hundred fifty of this article, the guardian of such person appointed pursuant to section seventeen hundred fifty of this article shall have the authority to make any and all health care decisions, as defined by subdivision six of section twenty-nine hundred eighty of the public health law, on behalf of the mentally retarded person that such person could make if such person had capacity. Such decisions may include decisions to withhold or withdraw life-sustaining treatment" (emphasis supplied).

In reaching the conclusion that the new provisions should be applied retroactively, the Surrogate relied upon this statutory text. It held that the use of the term "if any" in SCPA 1750-b "contemplates a situation where a guardian would have health care decision making authority, even in the absence of the SCPA 1750 determination" of whether the mentally-retarded person has the capacity to make his or her own health care decisions (*Matter of M.B., supra* at 330).

In enacting the Heath Care Decisions Act for Persons with Mental Retardation, the Legislature intended to eliminate discrimination against mentally-retarded persons who could never express their wishes with respect to life-sustaining treatment, to afford them "the same choices afforded to competent or formerly-competent patients" to refuse life-sustaining treatment (Mem of Senator Hannon in Support of L 2002, ch 500, 2002 NY Legis Ann, at 280). The "overarching motive" of the Legislature was:

> "(1) to clarify that decisions regarding life-sustaining treatment are part of the natural continuum of all health care decisions, (2) to allow decisions to end life-sustaining treatment only where the need is clearest (i.e. where patients are profoundly ill and *never had the ability to make such decisions for themselves*), (3) to utilize existing legal

standards wherever possible, and (4) *to maintain judicial oversight of close decisions*, with a statutory structure incorporating a workable standard for the court" (Mem of Senator Hannon in Support of L 2002, ch 500, 2002 NY Legis Ann, at 280 [emphasis supplied]).

A retroactive application of the new SCPA 1750 and 1750-b would serve the contrary purpose of depriving mentally-retarded persons with guardians appointed prior to March 16, 2003, of their statutory right under the new SCPA 1750 (2) to a determination of their capacity to make their own health care decisions.

The former statutory scheme also provided protections which will be lost with the retroactive application of the amendments. Guardians for mentally-retarded persons appointed pursuant to SCPA former 1750 were appointed based upon a certification that the mentally retarded person was "incapable to manage him or herself and/or his or her affairs by reason of mental retardation." No certification was made of the mentally-retarded person's capacity to make his or her own health care decisions. However, guardians appointed pursuant to SCPA former 1750 had similar powers as guardians appointed pursuant to Mental Hygiene Law article 81 (*see Matter of B.*, 190 Misc 2d 581, 585 [2002]). Mental Hygiene Law § 81.29 (e) authorizes the court to specifically grant or deny a guardian the power to give consent to the withdrawing of life-sustaining treatment. Such a determination is generally made based upon clear and convincing evidence of the patient's wishes (*see Wickel v Spellman*, 159 AD2d 576 [1990]; *Matter of Kyle*, 165 Misc 2d 175 [1995]).

The provision in the new SCPA 1750-b (4) which states that "[i]n the event that a guardian makes a decision to withdraw or withhold life-sustaining treatment from a mentally retarded person" the attending physician must confirm that the mentally retarded person lacks the capacity to make health care decisions (*see* SCPA 1750-b [4] [a]) provides no protection. This certification occurs when the decision to terminate life-sustaining treatment is made. Generally such a decision is made when a patient who may have been competent when well is unconscious or too sick to make health care decisions. By its terms, it would not protect mentally-retarded persons formerly competent to make health care decisions. Nor would it ensure any mentally-retarded person of an opportunity to be heard at a meaningful time and in a meaningful manner as to whether the guardian should have the power to withdraw or withhold life-sustaining treatment (*see Matter of Chantel R.*, 6 Misc 3d 693).

Under the new statutory scheme, the Surrogate must expressly deny a guardian the power to withhold or withdraw life-sustaining treatment if the Surrogate deems such a limitation appropriate (*see* SCPA 1750-b [1]). However, with respect to guardians appointed prior to the effective date of SCPA 1750-b, no such limitation was necessary since the guardian would have had to affirmatively seek the authority to withhold or withdraw life-sustaining treatment from the court, based upon clear and convincing evidence of the patient's wishes and/or the best interests of the mentally-retarded person. The retroactive application of SCPA 1750-b to guardians appointed pursuant to SCPA former 1750 would expand their powers without any consideration by the court as to whether such an expansion of authority would be appropriate.

The amicus curiae NYSARC, Inc., notes that "[u]nless the Court in this case finds that guardians appointed prior to March 16, 2003, the effective date of the Act, have the authority to make end-of-life decisions on behalf of their wards, thousands of guardians will be forced to expend both their own and judicial resources by seeking to have guardianship decrees and other related documents amended." However, each life is precious. A requirement of judicial intervention is not a waste of resources to insure that mentally-retarded persons are treated fairly and in accordance with all their rights.

Accordingly, we hold that SCPA 1750-b shall not apply to guardians appointed prior to its effective date, without a judicial determination specifically granting such guardians powers pursuant to SCPA 1750-b in accordance with the statutory safeguards set forth in SCPA 1750 (2). The order is reversed insofar as appealed from, on the law, without costs or disbursements, and the petition is granted.

H. MILLER, J.P., and ADAMS, JJ., concur.

SPOLZINO, J., dissents in a memorandum as follows: I share the serious concerns that prompt my colleagues to hold that the Health Care Decisions Act for Persons with Mental Retardation does not apply retroactively so as to authorize a guardian appointed prior to the adoption of that law to make health care decisions, including the decision to refuse medical treatment, for a mentally-retarded ward. Nevertheless, the Legislature has, in my view, resolved the limited issue presented on this appeal by providing clearly and unambiguously in the statute itself for its retroactive application. As I see it, in the absence of a constitutional challenge to such application, the Legislature has

thus put the issue beyond our purview. Since the petitioner has declined to make that challenge here, I would affirm the order of the Surrogate and therefore, I dissent, respectfully.

The Health Care Decisions Act for Persons with Mental Retardation (L 2002, ch 500 [hereinafter the 2002 amendments]) significantly amended the statutory provisions for the guardianship of mentally-retarded persons that had been established in article 17-A of the SCPA, adopted in 1969 (L 1969, ch 1143) and subsequently repealed and replaced in 1989 (L 1989, ch 675). Pursuant to the 2002 amendments, every medical certification made in support of the appointment of a guardian for a mentally-retarded person is now required to include "a specific determination . . . as to whether the mentally retarded person has the capacity to make health care decisions" for himself or herself (SCPA 1750 [2]). It is then incumbent upon the appointing court to consider the medical determination and, upon such consideration, to withhold from the guardian the authority to make health care decisions for the mentally-retarded person if it is appropriate to do so (see SCPA 1750-b). In the absence of an express judicial determination to withhold the authority to make health care decisions, however, such authority is conferred upon the guardian (see SCPA 1750-b [1]).

Despite the breadth of the authority that may be granted pursuant to the statute, the guardian's power to decline life-sustaining treatment for the mentally-retarded person is, nevertheless, circumscribed in several significant ways. The statute establishes specific substantive standards to which the guardian must adhere in making such a determination (see SCPA 1750-b [2]). In addition, there are specific procedures that must be followed. Among the procedural necessities are medical determinations that the mentally-retarded person does not have the capacity to make the decision for himself or herself and that he or she is in such condition that a determination to withdraw life-sustaining treatment is medically appropriate (see SCPA 1750-b [4] [a], [b]). The statute also sets forth specific requirements with respect to giving notice of the decision to family members and other interested parties identified in the statute and provides for timely judicial review of the decision in the event of an objection by such parties (see SCPA 1750-b [4] [e]; [5], [6]).

These provisions constitute a sharp break with prior decisional law. Although the New York courts have long recognized that a competent person may make life-ending medical decisions for

himself or herself, based upon the right recognized at common law to be free from unwanted medical treatment (*see Schloendorff v Society of N.Y. Hosp.*, 211 NY 125, 129 [1914]), such decisions may be made by a guardian only where the patient's intent with respect to such issues when competent can be established by clear and convincing evidence (*see Matter of Storar*, 52 NY2d 363, 379 [1981], *cert denied* 454 US 858 [1981]). Where that intent cannot be so established, necessary medical treatment may not be declined by a guardian or other surrogate decision-maker (*see Matter of Westchester County Med. Ctr. [O'Connor]*, 72 NY2d 517, 528, 530-531 [1988]). Thus, in the absence of statutory authority, the guardian of a mentally-retarded person who was never competent to make a reasoned decision about medical treatment is without power to withhold or withdraw life-sustaining treatment (*see Matter of Storar, supra*).

Recognizing the serious policy implications of its decision in *Matter of Storar*, the Court of Appeals expressly invited the Legislature to address the issue of surrogate decision-making for the mentally impaired (*see Matter of Storar, supra* at 382-383). Before 2002 however, the Legislature did not accept the Court's invitation. SCPA article 17-A did not address the issue of health care decision-making. Article 81 of the Mental Hygiene Law, enacted in 1992 and effective April 1, 1993, governing the guardianship of persons alleged to be incompetent, similarly left in place the common law rules as defined by the Court of Appeals (*see* Mental Hygiene Law § 81.29 [e]). The Legislature ultimately turned to the matter, however, in 2002, filling the gap in the law identified in *Storar* (*see* Turano, 2002 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 58A, SCPA 1750-b, 2005 Pocket Part, at 38-39), by adopting the amendments in issue, following a well-publicized controversy with respect to the unfortunate circumstances of Sheila Pouliot, a mentally-retarded person whose guardian was determined not to have the requisite authority based upon the Attorney General's reading of *Storar* (*see Blouin v Spitzer*, 213 F Supp 2d 184, 186-187 [2002], *affd* 356 F3d 348, 352-356 [2004]; *Matter of Chantel R.*, 6 Misc 3d 693, 696 [2004]).

Like Ms. Pouliot, M.B. was a mentally-retarded person for whom a guardian, R.B., had been appointed pursuant to SCPA article 17-A. As the majority correctly notes, this proceeding was commenced by Mental Hygiene Legal Services for a determination that SCPA 1750-b did not apply to R.B. on the ground that he had been appointed as M.B.'s guardian prior to the ef-

fective date of the 2002 amendments. The pleadings do not challenge the constitutionality of the retroactive application of the statute and no notice of a constitutional claim was ever provided to the Attorney General, as required by CPLR 1012 (b) and Executive Law § 71. The issue before us, therefore, is simply one of statutory construction.

"Amendments are presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated" (*Matter of Gleason [Michael Vee, Ltd.]*, 96 NY2d 117, 122 [2001]; *see Matter of Marino S.*, 100 NY2d 361, 370 [2003], *cert denied sub nom. Marino S. v Angel Guardian Children & Family Servs., Inc.*, 540 US 1059 [2003]). The issue of the retroactive application of a statute is thus, as the majority correctly notes, a question of the Legislature's intent (*see Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). It is axiomatic that the Legislature's intent is determined, in the first instance, on the basis of the language that the Legislature has employed (*see Patrolmen's Benevolent Assn. of City of N.Y. v City of New York*, 41 NY2d 205, 208 [1976]). It is also hornbook law that where the statutory language is clear and unambiguous, the court must construe that language so as to give effect to the plain meaning of the words used (*see New Amsterdam Cas. Co. v Stecker*, 3 NY2d 1 [1957]; *Bender v Jamaica Hosp.*, 40 NY2d 560 [1976]; *Meltzer v Koenigsberg*, 302 NY 523 [1951]). Here, in my view, the language employed by the Legislature leads clearly and unambiguously to the conclusion that the Legislature intended for the authority to make health care decisions for mentally-retarded persons, as granted by the 2002 amendments, to be applied to all guardians, even those appointed prior to the effective date of those amendments.

SCPA 1750-b (1) provides that the authority to make health care decisions is within the general grant of authority to the guardian, "[u]nless specifically prohibited by the court." Critically, the statute provides that the court must make that decision after considering the medical determination with respect to the capacity of the mentally-retarded person, "if any," that is now a required part of the guardianship petition (*see* SCPA 1750-b [1]). Thus, health care decision-making authority can be granted in the absence of the medical determination as to capacity. Reading these two provisions together, the authority to make health care decisions is thus included within the grant to the guardian, in the absence of a judicial decision to the contrary,

even in those cases where there has been no medical determination with respect to competency.

Moreover, since the statute now mandates that such a medical determination be made in all proceedings under article 17-A, after the effective date of the 2002 amendments, the language addressing the absence of such a determination is meaningless unless it applies to those situations where the guardian was appointed prior to the amendments. If we are to read the statute so as to give effect to all of its provisions, as we must (*see Rangolan v County of Nassau*, 96 NY2d 42, 48 [2001]; McKinney's Cons Laws of NY, Book 1, Statutes § 97), this provision thus requires that the statute apply retroactively.

The Legislature's intent that previously-appointed guardians have the authority granted by the amendments to make health care decisions is also apparent from the manner in which it defined the effective date of the statute. Although the amendments generally became effective 180 days after they became law, the provisions requiring the certification of capacity to make health care decisions were treated differently, becoming effective only with respect to those determinations made on or after the effective date of the statute (L 2002, ch 500, § 4). Had the Legislature intended that no guardian should have the power to make health care decisions without having been so authorized under the newly-established process, as the majority contends, it could simply have avoided any reference to SCPA 1750 in the general clause providing for the effective date of the amendments. The fact that it did not do so is telling.

If these provisions were not, by themselves, sufficient to establish the Legislature's intent, however, the Legislature was even more direct. The statutory provision that mandates the medical determination specifically provides that "[t]he absence of this determination in the case of guardians appointed prior to the effective date of this subdivision shall not preclude such guardians from making health care decisions" (SCPA 1750 [2]). Since the term "health care decisions," defined by reference to section 2980 (3) of the Public Health Law, includes the authority to refuse medical treatment (Public Health Law § 2980 [6]), the authority of the previously-appointed guardian is clear.

Despite this language, my colleagues in the majority would decline to apply the 2002 amendments to previously-appointed guardians. In so doing, they read the legislative history to find that retroactive application of the amendments would be inconsistent with the Legislature's "overarching motive" of allowing

end-of-life decisions to be made for mentally-retarded persons who "never had the ability to make such decisions for themselves" only after a judicial determination as to their prior capacity. As a result, my colleagues find that by the retroactive application of the 2002 amendments, a mentally-retarded person for whom a guardian was previously appointed, would be deprived of the right provided thereunder to determination of his or her medical decision-making capacity before such authority may be exercised by a guardian. In my view, however, the legislative memorandum upon which my colleagues rely to reach their conclusion is not quite as clear as they read it to be in expressing the intent they find.

Initially, the memorandum upon which the majority relies expressly states that "the absence of such a determination [as to capacity to make health care decisions] in the case of guardians appointed prior to this act shall not preclude their making such decisions" (Senate Mem in Support, 2002 McKinney's Session Laws of NY, at 2002). Even were we to ignore this express statement with regard to the issue of retroactivity, the memorandum expressly asserts that the discrimination with which the statute is concerned is not discrimination against mentally-retarded persons by denying them the common law right to personal autonomy that is recognized for competent persons, but rather, is discrimination against mentally-retarded persons by refusing to allow their guardians to make the same health care decisions that can be made by competent persons. Referring to the common-law rule that life-sustaining treatment cannot be withheld in the absence of "clear and convincing evidence" that to do so would be consistent with the patient's intent when competent (*Matter of Westchester County Med. Ctr. [O'Connor], supra* at 529; *see Matter of Storar, supra* at 379), the legislative memorandum states:

> "This clear and convincing evidence rule has been applied to thwart decisions even by court-appointed guardians, who in almost every other respect step into the shoes of their wards, and can make any decisions their wards could have made if competent.

> "In precluding the withholding or withdrawal of life sustaining treatment from mentally retarded persons, the clear and convincing evidence rule clearly discriminates against this particularly vulnerable segment of the population by denying them the

same choices afforded to competent or formerly-competent patients" (Senate Mem in Support, 2002 McKinney's Session Laws of NY, at 2003-2004 [internal quotation marks omitted]).

Finally, if the intent as to the retroactive application of the 2002 amendments was not sufficiently expressed already, the memorandum states that this bill *"clarifies* that guardians of mentally retarded persons *have* the authority to make the full range of health care decisions for them" (Senate Mem in Support, 2002 McKinney's Session Laws of NY, at 2004 [emphasis supplied]).

I thus differ with my colleagues in my reading of the legislative memorandum as supporting the retroactive application of the 2002 amendments. But legislative history, however one reads it, is not statutory text. While contemporaneous legislative statements are instructive in establishing the Legislature's intent with respect to ambiguous provisions (*see Rankin v Shanker*, 23 NY2d 111 [1968]; *see also* McKinney's Cons Laws of NY, Book 1, Statutes § 92 [b]), they do not overcome the language that the Legislature actually adopted and the Governor actually approved. Here, that language is, in my view, clear, for the reasons I have stated above. In the absence of a countervailing legal basis for doing so, we are not at liberty to disregard that clear and unambiguous expression of the Legislature's intent and we must give effect to the plain meaning of the statute (*see Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98 [1997]; *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York, supra; Tompkins v Hunter*, 149 NY 117, 122-123 [1896]).

The concerns raised by the majority would clearly be implicated, in a manner cognizable by the courts, in a constitutional challenge to the retroactive application of the statute. There is no doubt that it can be seriously, and perhaps successfully, argued that granting to a guardian the authority to make potentially life-ending medical decisions for a mentally-impaired person without first ascertaining through a judicial process whether that person, when capable, would have made that choice deprives the impaired person of life without due process of law or denies to him or her the equal protection of the laws. However, since the petitioner chose not to raise such a claim in this proceeding, that issue is not presented in this case.

Thus, despite the importance of the constitutional issues that may be raised in some future case, I would decide this case on the basis of the issue that has been presented, which is whether the Legislature intended that SCPA 1750-b apply retroactively.

Although I disagree with the majority, I join my colleagues in recognizing that there are few issues presented in the law as serious and as difficult as defining the circumstances under which life-sustaining medical treatment may be refused. The issue of when one person may be authorized to make medical decisions that will likely result in the death of another is exponentially more complicated, as witnessed by recent national developments (*see Schiavo ex rel. Schindler v Schiavo*, 404 F3d 1282 [2005]; *see also Cruzan v Director, Mo. Dept. of Health*, 497 US 261 [1990]; *Matter of Conroy*, 98 NJ 321, 486 A2d 1209 [1985]; *Superintendent of Belchertown State School v Saikewicz*, 373 Mass 728, 370 NE2d 417 [1977]; *Matter of Quinlan*, 70 NJ 10, 355 A2d 647 [1976], *cert denied sub nom. Garger v New Jersey*, 429 US 922 [1976]).

In the absence of the statute, I would concur that we should err on the side of life, as *Matter of Storar* (*supra*) requires. Were I a legislator, I might be persuaded by the majority of the wisdom of applying the statutory amendments prospectively only. As a judge, however, I am not free to make that determination in the face of statutory language to the contrary. Since I believe that the Legislature unequivocally expressed in the legislation itself its intent that the statutory amendments in issue here apply retroactively, I would affirm the order of the Surrogate insofar as appealed from.

Ordered that order is reversed insofar as appealed from, on the law, without costs or disbursements, and the petition is granted.